227 P.3d 481

Joseph SOLIMENO and Donna Kay Solimeno, as the surviving parents of Doreen Pullin, decedent and on behalf of all statutory beneficiaries, including Nicholas Pullin, and Joshua Pullin, surviving sons, and Paul Pullin, minor surviving son, Plaintiffs/Appellees,

v.

Abdullah M. YONAN, M.D. and Nawal P. Yonan, husband and wife; Phoenix Medical Group, P.C., an Arizona corporation, Defendants/Appellants.

No. 1 CA–CV 09–0139.

Court of Appeals of Arizona, Division 1, Department A.

March 18, 2010.

Raymond J. Slomski, Jr., P.C. By Raymond J. Slomski, Jr., Phoenix, Amy G. Langerman, P.C. By Amy G. Langerman, California, Attorneys for Plaintiffs/Appellees.

Jones Skelton & Hochuli P.L.C. By Stephen A. Bullington, Eileen Dennis GilBride, William R. Jones, Jr., Phoenix, Attorneys for Defendants/Appellants.

1. Like the parties and the trial court, we sometimes refer to the blood clots as pulmonary emboli or "PE."

## OPINION

DOWNIE, Judge.

¶ 1 Abdullah M. Yonan, M.D., Nawal P. Yonan, and Phoenix Medical Group, P.C. ("defendants") challenge the superior court's order that they pay attorneys' fees and costs as a sanction for a mistrial declared after the court found they violated pretrial disclosure requirements. We affirm and hold that a medical malpractice defendant who also testifies as a standard of care expert is subject to expert disclosure requirements regarding that issue. We also hold that a party who causes a mistrial may, under appropriate circumstances, be assessed monetary sanctions under Arizona Revised Statutes ("A.R.S.") section 12–349(A)(3) (2003).

## FACTS AND PROCEDURAL HISTORY

¶ 2 Doreen Pullin was admitted to the intensive care unit ("ICU") of a local hospital with breathing difficulties. Tests revealed she had "extensive bilateral pulmonary emboli" or blood clots in both lungs.[1] Dr. Yonan, a pulmonologist, managed Ms. Pullin's care in the ICU. The day after she was admitted, Ms. Pullin suffered cardiac arrest and died as a result of the blood clots.

¶ 3 Plaintiffs filed a medical negligence/wrongful death action against defendants.[2] The primary contested issue was whether Dr. Yonan fell below the standard of care by using heparin to prevent further propagation of the clots rather than prescribing thrombolytic drugs ("thrombolytics") to dissolve Ms. Pullin's blood clots.

¶ 4 A jury trial began May 27, 2008. During plaintiffs' case in chief, defendants made numerous objections on the grounds of nondisclosure. On those occasions, the trial court asked plaintiffs' attorney whether and how disclosure had been made. It sustained objections when counsel could not establish proper pretrial disclosure.

¶ 5 On the fifth day of trial, plaintiffs rested. Defendants began their case in chief by

2. Other defendants were originally named, but they were dismissed before trial and their conduct is not at issue in this appeal.

calling Dr. Yonan to the stand. Dr. Yonan testified about the physiology of shock, interpreted Ms. Pullin's test results, and explained his experience with and professional opinions regarding treating blood clots with thrombolytics. Believing Dr. Yonan's opinion testimony had not been properly disclosed, plaintiffs objected and, outside the jury's presence, moved for a mistrial. The trial court found a disclosure violation about key disputed issues and declared a mistrial.

¶ 6 Plaintiffs filed a motion for sanctions, seeking attorneys' fees and costs under Arizona Rule of Civil Procedure ("Rule") 37(c) and A.R.S. § 12–349(A)(3). After briefing and argument, the trial court awarded plaintiffs $125,000 pursuant to A.R.S. § 12–349(A)(3) because defendants' failure to disclose "both expanded and delayed the proceedings."

¶ 7 Defendants timely appealed. We have jurisdiction pursuant to A.R.S. § 12–2101(B), (D) (2003).

### DISCUSSION

¶ 8 Defendants assert three errors on appeal: (1) the determination they violated pretrial disclosure requirements; (2) the imposition of sanctions under A.R.S. § 12–349; and (3) the amount of the sanctions award.

### 1. Disclosure Issues

¶ 9 Whether a disclosure obligation exists in the first instance is a question of law that we review *de novo.* Assuming such an obligation exists, a trial court has broad discretion in determining whether evidence has been properly disclosed and whether it should be admitted at trial. *See Link v. Pima County,* 193 Ariz. 336, 338, ¶ 3, 972 P.2d 669, 671 (App.1998). Trial judges are better able than appellate courts to decide if a disclosure violation has occurred in the context of a given case and the practical effect of any non-disclosure. Such decisions will not be disturbed on appeal absent an abuse of discretion. *Id. See also Allstate Ins. Co. v. O'Toole,* 182 Ariz. 284, 287, 896 P.2d 254, 257 (1995) ("We have encouraged trial courts to take firm, active roles in the application and enforcement of [the disclo-

sure] rules that were specifically designed to curb discovery abuse, excessive cost, and delay. We have pledged to support them if they do.").

### a. Dr. Yonan was testifying as an expert

¶ 10 We disagree with defendants' assertion that Dr. Yonan was not testifying as an expert witness and that the general disclosures they made about him prior to trial were sufficient. In their initial disclosure statement, defendants revealed Dr. Yonan would "testify that his treatment of Doreen Pullin complied with the applicable standard of care in all respects." Defendants made this disclosure under a heading that read: *NAME AND ADDRESS OF EACH PERSON WHOM THE DISCLOSING PARTY EXPECTS TO CALL AS AN EXPERT WITNESS AT TRIAL, THE SUBJECT MATTER ON WHICH THE EXPERT IS EXPECTED TO TESTIFY, THE SUBSTANCE OF THE FACTS AND OPINIONS TO WHICH THE EXPERT IS EXPECTED TO TESTIFY, A SUMMARY OF THE GROUNDS FOR EACH OPINION, THE QUALIFICATIONS OF THE WITNESS, AND THE NAME AND ADDRESS OF THE CUSTODIAN OF COPIES OF ANY REPORTS PREPARED BY THE EXPERT.* (Original emphasis.)

¶ 11 In medical malpractice cases, a defendant physician may testify regarding his or her adherence to the standard of care in addition to calling an independent standard of care expert witness. Rule 26(b)(4)(D), dealing with expert witnesses, states, in pertinent part:

In medical malpractice cases, each party shall presumptively be entitled to only one standard-of-care expert. *A defendant may testify on the issue of that defendant's standard-of-care in addition to that defendant's independent expert witness* and the court shall not be required to allow the plaintiff an additional expert witness on the issue of the standard-of-care.

(Emphasis added.)

¶ 12 The challenged trial testimony related to the standard of care. Dr. Yonan's defense

was that he complied with the standard of care by prescribing heparin for Ms. Pullin (which his counsel described as "the gold standard treatment") versus thrombolytic drugs, which carry "significant risk" and are indicated only if a patient is in shock. The testimony at issue was clearly intended to inform the jury that, in Dr. Yonan's opinion, the patient was not in shock, and thus his course of treatment complied with the standard of care.

### b. Disclosures of Dr. Yonan's opinions were inadequate

¶ 13 Arizona's rules of civil procedure mandate extensive pretrial disclosures regarding expert witnesses, requiring disclosure of:

> The name and address of each person whom the disclosing party expects to call as an expert witness at trial, the subject matter on which the expert is expected to testify, *the substance of the facts and opinions to which the expert is expected to testify, a summary of the grounds for each opinion,* the qualifications of the witness and the name and address of the custodian of copies of any reports prepared by the expert.

Rule 26.1(a)(6) (emphasis added).

¶ 14 We agree with Dr. Yonan that the rules do not require "scripting" of an expert's testimony. *Englert v. Carondelet Health Network,* 199 Ariz. 21, 25, ¶¶ 6–7, 13 P.3d 763, 767 (App.2000) (requiring disclosure of a fair description and the substance of facts and opinions of testimony, but not a "detailed scripting."). We reject, however, the suggestion that the trial court imposed a scripting standard here.[3]

¶ 15 As the trial court correctly observed, defendants' pretrial disclosures about Dr. Yonan were extremely general, stating he would testify

> regarding his care and treatment of Ms. Pullin and any conversations he had with

Ms. Pullin, any of her family members, or any of her health care providers. It is anticipated that Dr. Yonan will testify consistent with the medical records. It is also anticipated that Dr. Yonan will testify regarding his background, training, and experience. Dr. Yonan will testify that his care and treatment of Ms. Pullin complied with the applicable standard of care in all respects and did not cause any injury to Ms. Pullin.

We agree with the trial court that, as to the standard of care, defendants did not disclose "the substance of the facts and opinions to which [Dr. Yonan] is expected to testify" or "a summary of the grounds for each opinion." Rule 26.1(a)(6).

¶ 16 Nor did Dr. Yonan's deposition testimony adequately supplement defendants' disclosure statement. Although Dr. Yonan discussed certain signs of shock during his deposition, he never mentioned acidosis, troponin levels, or kidney function—all critical conditions or values according to his testimony before the jury. Additionally, when plaintiffs' counsel inquired at deposition why thrombolytics would ever be used, Dr. Yonan quoted medical authorities, characterized the drugs as a "last resort" treatment (even for individuals in shock), and stated, "You may ... give thrombolytics.... But after one month [the patient] will die." At trial, on the other hand, Dr. Yonan detailed his own personal history of prescribing thrombolytics on approximately ten occasions. And, contrary to the outcome about which he testified at deposition, the patients who received thrombolytics under Dr. Yonan's care lived, though several experienced serious bleeding complications.

¶ 17 Defense counsel conceded that defendants had not specifically disclosed Dr. Yonan's history and experience with thrombolytics, but argued the general information in the disclosure statement was sufficient. At several points, the trial court commented on

---

**3.** The trial court was aware scripting was not required, stating:

> That's not a script. That's an area. That's—the key issue in the case is whether lytics should have been given, and whether Dr. Yonan should have given lytics. To say, "and I

didn't think I needed to disclose that he'd done that ten times before" shocks me that you would not even have considered that that was something that you should talk about or disclose. It's so obvious that I can't believe you would think that.

the materiality of this evidence, stating, "[T]he key point here as to whether [Dr. Yonan] treats—whether lytics should have been used—and that's what we've been sitting here for six days now talking about, is whether he should have used lytics." Additionally, the court described the jurors' reaction to Dr. Yonan's testimony, stating:

> [T]hese were key issues upon which he testified. I thought his testimony here was very powerful. And when he started talking about his experience with giving lytics with patients, virtually every juror started taking notes on the subject. They were impressed, as well.[4]

¶ 18 Also at trial, Dr. Yonan was asked how to define "shock." He proceeded to testify not only about general signs and symptoms of shock, but he applied them directly to Ms. Pullin's case by interpreting and applying test results and clinical observations. For example, Dr. Yonan testified regarding:

- Troponin (cardiac enzyme) levels. Dr. Yonan's trial testimony was that Ms. Pullin's "troponin level was normal. So by that, we know that there was no significant damage to the heart muscle."
- Lactic acidosis (lack of oxygen to vital organs and a critical component to shock). Dr. Yonan testified that Ms. Pullin's blood tests revealed normal $CO_2$ levels, so "there was no sign of acidosis."
- Kidney function. Dr. Yonan testified one factor he considered in determining whether Ms. Pullin was in shock (i.e., whether thrombolytics were indicated) was her normal kidney function, which meant her kidneys were receiving adequate perfusion.

¶ 19 The trial court found additional disclosure violations regarding these points. In discussing Dr. Yonan's testimony about troponin levels, the court explained:

> I think that's another one of the key issues in this case. It's not like, well, she had

4. At the hearing on plaintiffs' motion for sanctions, the trial court described Dr. Yonan's testimony even more forcefully, stating:

> And I've got to tell you, I watched the jury, and in my own mind, I thought to myself, "Wow. This is pretty devastating testimony."

some problem with her liver and I didn't talk about it. The key issue in this case is the heart problem caused by the PE. And to say now I've got something that shows there was no heart problem, no heart damage, but I didn't disclose it, but I'm going to have him testify about it in the fifth day of trial is a problem. I think you sandbagged here....

Dr. Yonan's testimony about the significance of Ms. Pullin's troponin levels directly rebutted plaintiffs' claim that she suffered heart dysfunction and failure that, under the applicable standard of care, required the doctor to prescribe thrombolytic drugs.

¶ 20 Dr. Yonan never testified about or identified the significance of lactic acidosis or $CO_2$ levels prior to trial. Nor did defendants disclose that Ms. Pullin's kidney function was a basis for Dr. Yonan's opinion that she was not in shock, and thus, that thrombolytic drugs were not required.

¶ 21 Both in the trial court and on appeal, defendants emphasize that they disclosed Dr. Yonan would testify "consistently with the medical records" and "regarding his background, training, and experience." But as the trial court noted, there is a significant difference between a doctor testifying about raw test results that are included in a disclosed medical record (e.g., troponin and $CO_2$ levels) and explaining to the jury the significance of those results and how they are relevant in selecting a course of treatment that complies with the standard of care.

¶ 22 Moreover, defendants themselves relied on such distinctions when objecting during plaintiffs' case in chief. For example, when Dr. Lawrence Repsher testified on direct examination, the following occurred:

Q. [PLAINTIFFS' COUNSEL]: Did the patient's urine output in this case [a factor in determining kidney function] indicate further evidence of shock?

A. Yes.

> And the jury all went down with their pens and they started writing down the issues about the ten times he's used lytics and all the various— the issues that were discussed when we were discussing the mistrial were, to my mind, I thought devastating for Mr. Slomski's case.

[DEFENSE COUNSEL]: Your Honor, lack of disclosure and beyond the scope of cross.

. . . .

THE COURT: Well, two different issues. It's not beyond the subject of cross if it goes to the issue of shock. But was it disclosed?

[PLAINTIFFS' COUNSEL]: It came up—

[DEFENSE COUNSEL]: Never.

[PLAINTIFFS' COUNSEL]:—recently.

THE COURT: You had not disclosed it?

[PLAINTIFFS' COUNSEL]: Not before—not until—not until he brought this up was it referenced.

THE COURT: Sustained.

On appeal, defendants concede that Ms. Pullin's "kidney function was captured in the medical record." Later, when Dr. Allen Lipschultz testified, plaintiffs' counsel asked about a chest x-ray that was in the medical records. The following colloquy transpired:

Q. Chest X ray in this case showed what?

A. Normal, essentially. You could argue that the X ray was dark, suggesting that there was not enough blood in the lungs. Dark film could suggest pulmonary emboli.

[DEFENSE COUNSEL]: Objection, Your Honor. Disclosure.

THE COURT: Was it disclosed?

[PLAINTIFFS' COUNSEL]: That the dark film—the dark film wasn't disclosed.

THE COURT: Well, then, he can't testify about it if it hasn't been disclosed.

[PLAINTIFFS' COUNSEL]: Okay.

THE COURT: The jury will disregard his last comments.

¶ 23 Dr. Yonan implies the information at issue would have been disclosed if opposing counsel had simply asked the correct questions at deposition or sought additional pretrial disclosures. Such reasoning is inconsistent with a party's affirmative disclosure obligations under Rule 26.1. *See Norwest Bank (Minn.), N.A. v. Symington*, 197 Ariz. 181, 185–86, ¶ 17, 3 P.3d 1101, 1105–06 (App. 2000) ("[A]t the outset of a case the parties must make a full ... disclosure of all relevant information.... No longer will it be advantageous to play games of semantics ('If he'd have just asked the right question, I would gladly have disclosed the material').").

¶ 24 We also reject defendants' claim that they had an inadequate opportunity to respond to the disclosure objections. After plaintiffs made their mistrial request, defense counsel was able to proffer multiple arguments why pretrial disclosures were adequate, though he also requested additional time to review the record. The trial court refused, stating counsel had been given that "opportunity all afternoon and you haven't been able to do it." [5]

¶ 25 Moreover, by the time defendants began presenting their case, it should have been abundantly clear the trial court would strictly enforce Rule 26.1 and place the burden of proving disclosure on the offering party when an objection was raised. The court's consistent handling of such objections was demonstrated during plaintiffs' case in chief, when defendants frequently objected on the basis of non-disclosure.[6]

¶ 26 Even assuming *arguendo* that the trial court should have given defendants until the next morning to supplement their disclosure arguments, the record reveals no prejudice. Neither in post-mistrial filings nor on appeal have defendants demonstrated that they in fact adequately disclosed the substance of the facts and opinions Dr. Yonan

5. The record reflects plaintiffs moved for a mistrial June 3 at approximately 2:42 p.m., and the court ordered a mistrial at roughly 4:19 p.m., after hearing arguments from the parties, discharging the jury for the evening, and taking three brief recesses.

6. Additionally, immediately before defendants began their case in chief, plaintiffs' counsel observed, "I think we have greater clarity as to the rigor of disclosure in this case," and asked "for

similar application as it relates to Dr. Yonan." The trial court commented on its enforcement of the disclosure rules, stating at one point:

Well, you know, Mr. Bullington, you've been repeatedly objecting to nondisclosure issues, and I've been holding Mr. Slomski's feet to the fire. If it hasn't been disclosed previously, I haven't been allowing it in. I don't know why your situation should be different.

would offer at trial as to the standard of care or a summary of the grounds for each of his opinions.

¶ 27 The trial court did not abuse its discretion in finding disclosure violations.

## 2. Basis for Sanctions Award

■ ¶ 28 The trial court imposed sanctions against defendants pursuant to A.R.S. § 12–349(A)(3). That statute provides, in pertinent part:

A. Except as otherwise provided by and not inconsistent with another statute, in any civil action commenced or appealed in a court of record in this state, *the court shall assess reasonable attorney fees, expenses* and, at the court's discretion, double damages of not to exceed five thousand dollars against an attorney or party, including this state and political subdivisions of this state, *if the attorney or party does any of the following:*

1. Brings or defends a claim without substantial justification.
2. Brings or defends a claim solely or primarily for delay or harassment.
3. *Unreasonably expands or delays the proceeding.*
4. Engages in abuse of discovery.

(Emphasis added.)

¶ 29 In explaining its application of § 12–349(A)(3), the trial court stated:

Defendants' failure to disclose undoubtedly both expanded and delayed the proceedings in this case since a new trial is necessary. The Court finds that Defendants' pretrial failure to disclose, and subsequent revelation of the undisclosed information at trial, was unreasonable. The information was directly relevant to the key issue in the case, and defendants could not have believed reasonably that it did not need to be disclosed. As a result, sanctions are appropriate.

The court further found "it would be contrary to the statute's intended purpose to deter unreasonable conduct if the Court were to deny a fee award in this situation."

¶ 30 We review application of a statute *de novo. Phoenix Newspapers, Inc. v. Dep't of Corr.,* 188 Ariz. 237, 244, 934 P.2d 801, 808 (App.1997). In construing a statutory provision, we first consider the statute's language as the best and most reliable index of the statute's meaning. *Zamora v. Reinstein,* 185 Ariz. 272, 275, 915 P.2d 1227, 1230 (1996) (citing *State v. Williams,* 175 Ariz. 98, 100, 854 P.2d 131, 133 (1993)). "If the language is clear, the court must apply it without resorting to other methods of statutory interpretation unless application of the plain meaning would lead to impossible or absurd results." *Bilke v. State,* 206 Ariz. 462, 464, ¶ 11, 80 P.3d 269, 272 (2003) (internal citations and quotations omitted).

¶ 31 Although Arizona appellate cases have not specifically addressed an award of fees and costs under § 12–349(A)(3) based on a mistrial in a civil case, defendants have cited no authority prohibiting such an award. By its own terms, the statute is broad, applying "[e]xcept as otherwise provided by and not inconsistent with another statute." Defendants have identified no statute that "otherwise provide[s]" or that is inconsistent with a sanctions award under these circumstances. Their reliance on *Taylor v. So. Pac. Transp. Co.,* 130 Ariz. 516, 637 P.2d 726 (1981), is unpersuasive. *Taylor* was decided four years before the enactment of A.R.S. § 12–349 and obviously did not address the grounds enumerated in that statute for an award of attorneys' fees.

¶ 32 According to Dr. Yonan, fees and costs can be assessed pursuant to § 12–349(A)(3) only when a "party delays or expands proceedings by continuing to file inappropriate pleadings to try to keep the lawsuit going." We disagree with such a narrow interpretation of the statute. Under § 12–349(A)(3), the relevant question is whether a party's (or attorney's) actions caused unreasonable delay and expansion of the proceedings. Here, defendants' failure to disclose necessitated a mistrial on day five of a jury trial that was nearing its end. Defendants' actions significantly delayed and expanded the litigation because a new trial was required several months later, and the time devoted to the first trial was largely wasted.

These facts are sufficient for an award of sanctions under A.R.S. § 12–349(A)(3).

¶ 33 An independent basis exists for affirming the sanctions award. *See State v. Robinson*, 153 Ariz. 191, 199, 735 P.2d 801, 809 (1987) (holding that an appellate court may affirm a trial court on any basis supported by the record). Plaintiffs requested sanctions pursuant to both Rule 37(c) and A.R.S. § 12–349. The trial court deemed Rule 37(c) inapplicable because "[p]laintiffs are seeking fees and costs for trial-related activities, not for fees and costs for 'investigation or discovery.'" This Court has, however, affirmed an award of attorneys' fees and costs under Rule 37(c) following a mistrial caused by violations of the disclosure rules. *See Sec. Title Agency, Inc. v. Pope*, 219 Ariz. 480, 504–05, ¶ 109–11, 200 P.3d 977, 1001–02 (App.2008) (finding "Rule 37(c)(1) further provides that 'other appropriate sanctions' may be imposed on the party, including reasonable expenses and attorney fees 'caused by the failure' to disclose."). In addition to A.R.S. § 12–349(A)(3), sanctions were appropriate pursuant to Rule 37(c)(1).

### 3. Amount of Sanctions Award

¶ 34 After ruling that sanctions under § 12–349(A)(3) were appropriate, the trial court identified the types of fees and costs that plaintiffs could recover, stating:

Plaintiffs shall be awarded reasonable fees and costs associated with the Defendants' unreasonable conduct. This may include a reasonable attorneys' fee for trial preparation work that cannot be used at the retrial, attendance at the first trial, and work associated with the Motion for Sanctions, as well as expert witness costs incurred by Plaintiffs.

¶ 35 Plaintiffs requested $155,460 in fees and $24,407.99 in costs, for a total award of $179,867.99. The trial court ordered defendants to pay $125,000 for fees and costs.

¶ 36 "The determination of whether the amount of attorney's fees is reasonable is a matter peculiarly within the discretion of a trial court, and will not be disturbed absent a showing of abuse of that discretion." *Harris v. Reserve Life Ins. Co.*, 158 Ariz. 380, 384,

762 P.2d 1334, 1338 (App.1988) (internal citation omitted). In reviewing for an abuse of discretion, "[t]he question is not whether the judges of this court would have made an original like ruling, but whether a judicial mind, in view of the law and circumstances, could have made the ruling without exceeding the bounds of reason. We cannot substitute our discretion for that of the trial judge." *Associated Indem. Corp. v. Warner*, 143 Ariz. 567, 571, 694 P.2d 1181, 1185 (1985) (quoting *Davis v. Davis*, 78 Ariz. 174, 179, 277 P.2d 261, 265 (1954) (Windes, J., specially concurring) ). In reviewing a trial court's fee award, we view the record in the light most favorable to sustaining the trial court's decision. *Rowland v. Great States Ins. Co.*, 199 Ariz. 577, 587, ¶ 31, 20 P.3d 1158, 1168 (App. 2001) (citations omitted).

¶ 37 Applying these tenets of appellate review, we find no abuse of discretion. We consider only the objections that defendants raised in the trial court. *See Alano Club 12, Inc. v. Hibbs*, 150 Ariz. 428, 431, 724 P.2d 47, 50 (App.1986) (holding that an appellate court will not consider issues and theories not presented to the court below). Those objections were: insufficient detail in plaintiffs' time itemizations (e.g., entries such as "trial preparation" or "trial attendance"); transferability of claimed fees and costs to the new trial; the attorneys' hourly rate; the reasonableness of two lawyers and two paralegals attending trial; excessive fees relating to the motion for sanctions; and excessive expert fees.

¶ 38 As previously noted, the trial court reduced plaintiffs' claims by more than thirty percent. We decline to substitute our judgment for that of the trial court by engaging in an item-by-item analysis of each objection. Generally, though, we find plaintiffs' time entries sufficient under *Schweiger v. China Doll Restaurant*, 138 Ariz. 183, 673 P.2d 927 (App.1983), especially where, as here, the case was to be retried, and plaintiffs were understandably wary of disclosing too much of their trial preparation and strategy through billing records. The record includes a breakdown of fees and costs, actual time records for attorneys and paralegals, and

billings from experts that detail time devoted to trial preparation, travel, and even parking.

¶ 39 The *China Doll* requirements are meant to "enable the court to assess the reasonableness of the time incurred." *Orfaly v. Tucson Symphony Soc.*, 209 Ariz. 260, 266, ¶ 23, 99 P.3d 1030, 1036 (App.2004). Nothing suggests the trial court here had any difficulty determining the reasonableness of the claimed fees; nor is our review hampered by the billing descriptions. *See also State ex rel. Goddard v. Gravano*, 210 Ariz. 101, 110, ¶ 41, 108 P.3d 251, 260 (App.2005) (holding that, although additional detail in fee applications might have assisted the trial judge, the court has other alternatives for acquiring such information such as an evidentiary hearing).

¶ 40 Both in the trial court and on appeal, plaintiffs explained the necessity of two attorneys and two paralegals attending trial. We note that two defense lawyers also attended trial, and plaintiffs claim one defense paralegal was also present. Plaintiffs also persuasively argued that opposing counsel's hourly rates for an insurance defense client should not dictate the upper limit for their fees and produced a fee agreement for *in camera* inspection that set an hourly rate of $350 for the lawyers in the event they were discharged before the litigation ended.

¶ 41 As for defendants' claim that fees relating to the motion for sanctions and expert witnesses were excessive, we again note the substantial reduction of the award by almost $55,000. Moreover, the trial court had the opportunity to observe the work of counsel and experts during pretrial proceedings and five days of trial. It was better able than we to determine what was reasonable. The same is true of assessing the time and costs that should be compensated because they would not readily transfer to a second trial conducted eleven months after the first trial.

¶ 42 We find no abuse of discretion in setting the amount of the sanctions award.

## CONCLUSION

¶ 43 For the foregoing reasons, we affirm the trial court's rulings. Plaintiffs have re-quested attorneys' fees on appeal, arguing, "this appeal is necessitated as a continuation of the expansion of the proceedings caused by the mistrial." We disagree. Absent a finding that defendants *unreasonably* delayed or expanded the proceedings by pursuing an appeal, additional fees under A.R.S. § 12–349 are inappropriate. Although we disagree with defendants' substantive arguments, their appeal was not unreasonable. Plaintiffs are, however, entitled to taxable costs on appeal upon compliance with Arizona Rule of Civil Appellate Procedure 21.

CONCURRING: MAURICE PORTLEY, Presiding Judge.

WINTHROP, Judge, Concurring.

¶ 44 For reasons briefly outlined below, I concur in the ultimate result reached by my colleagues, but write separately to comment on some of the issues raised by this appeal.

¶ 45 The adoption of formal disclosure rules was predicated on the notion that voluntary, detailed disclosure about one's case was not only the "right" thing to do, but would also lead to more efficient, cost-effective litigation, reducing discovery abuses and cost, and promoting early and better informed settlement efforts. In reality, however, the nature, extent and sufficiency of disclosure has become a "game" for those inclined to engage in sharp practices, a "trap" to the unwary who in good faith attempt to comply, and an absolute nightmare for the trial bench in attempting to fairly administer and enforce the disclosure requirements.

¶ 46 Rule 26.1 was altruistically designed to move civil litigation one step further away from the concept of "litigation by ambush," to allow a litigant to efficiently understand the facts and legal theories of an opponent's case, to discover the nature and identity of any documents or other exhibits which were relevant to the claim or defense, and to understand and fairly meet the anticipated testimony of the opponent's fact and expert witnesses. It was presumed that, if the disclosure rules were followed in good faith, much of the mind-numbing effort and cost associated with creating and answering non-uniform interrogatories would be eliminated,

and that the utilization of specific discovery devices such as requests for production, requests for admission and depositions could be narrowly tailored to "flesh out" the bones of the voluntary disclosures under Rule 26.1.

¶ 47 To a large extent, Rule 26.1 seems to work reasonably well in the pre-trial setting. Parties generally cooperate in terms of the nature and extent of disclosure, even in asking for or providing supplementation of disclosure, particularly in anticipation of and following depositions. Although there are always anecdotal exceptions, we sense that the "system" during the pre-trial phase is generally achieving its stated goals. Although not expressly stated in the Rule, it is generally understood that facts and opinions timely revealed in formal disclosure statements, interrogatory responses, document production and pre-trial depositions conducted before any discovery cut-off date are considered adequately disclosed for purposes of trial. *See generally* Committee note to 1996 and 1997 Amendments to Rule 37(c) ("[t]he committee wishes to reemphasize that the disclosure of the information need not be in a formal disclosure statement but can be in response to an interrogatory, request for production, request for admission, deposition, or an informal process so long as all parties are reasonably apprised of the identity of the witness, the information possessed by the witness, or other information sought to be admitted."). There may be the potential for controversy concerning the timeliness of supplementation, but the trial courts seem to be able to equitably manage those disputes.

¶ 48 Problems can occur, however, when the case proceeds to trial. Some counsel who generally have been quite cooperative during litigation and discovery now insist upon rigid enforcement of disclosure obligations. The trial bench has not been entirely uniform in its interpretation and enforcement of these obligations; however, this is not to lay any blame on the trial court. Instead, the problem created for the trial judges can be laid directly at the feet of overly-zealous counsel seeking what is, in large part, an artificial and sometimes inappropriate advantage over the opponent.

¶ 49 Defense counsel's argument that the complained-of opinions were generically disclosed and that the medical facts supporting the opinions were contained in the hospital chart is not entirely accurate and, to a large extent, misses the point. Here, in volunteering the information at issue, Dr. Yonan was not testifying strictly as a factual witness, but rather was testifying as an expert, offering retrospective opinions concerning his compliance with the standard of care.[7]

¶ 50 I do agree with my colleagues that, on this record, Dr. Yonan was in fact presenting himself as an expert on the standard of care, was offering standard of care opinions, and as such, was required by Rule 26.1(a)(6) to formally disclose not only "the substance of the facts and opinions to which the expert is expected to testify" but also a "summary of the grounds for each opinion." The essence of most of those opinions—including the central opinion that the patient was not in shock until just before her collapse—was in fact revealed both before and during the deposition, and I do not believe that further, formal supplemental disclosure concerning such opinion was required. Additionally, the facts and minutia of the patient's care—including her vital signs, clinical presentation and labo-

---

7. Although perhaps an artificial distinction, an argument could be made that if Dr. Yonan had been asked, as a factual matter, whether at any particular time while under his care he believed the patient's clinical condition (or vital signs or lab values) was such that he reasonably believed the patient was hemodynamically unstable or in physiologic shock, he could have responded, "No," and in response to an appropriate follow up question could have explained why he did not conclude the patient was in shock at the time. In that regard, he would be testifying as a percipient witness involved in the events, rather than clearly offering a retrospective opinion as to why his judgment at the time was in compliance with the applicable standard of care. Instead, Dr. Yonan apparently volunteered these opinions and the factual bases and experience-based rationale for same in response to a routine preliminary question on direct examination that did not, on its face, seek to elicit such comments. As with most "volunteered" statements, the trial court on objection would have been well within its discretion in striking the volunteered information and directing the witness to listen more closely to the question asked. Here, however, a motion for mistrial was made, and ultimately granted. The defendant did not directly appeal the granting of the mistrial, but rather argues that there was no disclosure violation.

ratory and diagnostic test results—were not only well known to both sides but detailed at length in the "factual" portion of their respective disclosure statements. How those facts either support or contradict a standard of care or causation opinion is appropriately the subject of pre-trial consultation with experts and deposition examination and, absent the filing of a partially or completely dispositive Rule 56 motion, need not be exhaustively reiterated or summarized in affidavits or competing supplemental disclosure statements. Here, each side's counsel consulted with and retained expert witnesses who were intimately familiar with the patient's medical data and how it related to the standard of care and causation issues. Accordingly, there was no surprise to either side concerning the medical data available on this patient, nor how it related to the standard of care or causation issues in the case. With one notable exception, the parties' expert witness disclosures were more than adequate under the rules of procedure.

¶ 51 I do however concur that, as to Dr. Yonan's reliance on his specific personal treatment experiences with thrombolytics in supporting his position that the applicable standard of care under these circumstances was one of caution, counseling the use of other treatment options, a disclosure violation did in fact occur. This specific basis for his opinion on compliance with the standard of care should have been affirmatively disclosed as required by the rule. It was not, and I believe on this point the trial court's conclusion was correct.

¶ 52 I also believe, however, that some responsibility rests with plaintiffs' counsel in deciding as an apparent tactical matter to not question Dr. Yonan in his deposition about any personal experiences with administering thrombolytics in similar clinical settings. This seems a predictable area of inquiry, relevant to both standard of care and causation, and important to explore, if only to compare those personal experiences with the statistical outcomes reported in the literature Dr. Yonan did reference and rely upon

during his deposition. Instead, counsel—a highly skilled and experienced specialist in medical negligence litigation—chose to aggressively and repetitively cross-examine the doctor on other points, seeking in part to extract certain concessions that might ultimately benefit his clients in subsequent settlement negotiations or at trial. This is, of course, a time-honored approach, and counsel cannot be entirely criticized for adopting such approach. And, without question, both a literal reading and common sense application of Rule 26.1(a)(6) should have led defense counsel to be more explicit and detailed in a timely supplemental expert witness disclosure concerning Dr. Yonan's personal experience as a basis for his opinion.

¶ 53 Therefore, under the facts presented by this case, I agree, at least in part, with the conclusion of the trial court and my colleagues that a disclosure violation occurred. I disagree, however, with the harsh sanction of a mistrial, although that issue was not directly appealed. Accordingly, because that ruling was not appealed, and even though the more appropriate sanction here would have been to sustain the objection, strike that portion of Dr. Yonan's testimony and consider a limiting instruction,[8] I must also concur in affirming the sanction imposed.

---

8. Although plaintiffs' counsel suggested at one point proposing a limiting instruction, he never did so, and instead re-urged the mistrial motion. The trial court did not give defense counsel any time to propose such an instruction; however, it must be noted that defense counsel did not ask for that opportunity. Instead, they asked for time to review prior disclosures and deposition testimony to rebut the presumptive finding of a disclosure violation.

that the doctrine of laches precludes Johnson from objecting to the settlement.