NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

MELISSA SMITH, *Plaintiff/Appellant,*

*v.*

MORGAN R. OLSEN, et al., *Defendants/Appellees.*

No. 1 CA-CV 25-0572

FILED 04-08-2026

Appeal from the Superior Court in Maricopa County
No. CV2022-052105
The Honorable Dewain D. Fox, Judge

**AFFIRMED IN PART; VACATED IN PART**

COUNSEL

Michael P. Fiflis, Scottsdale
*Counsel for Plaintiff/Appellant*

Papetti Samuels Weiss McKirgan LLP, Scottsdale
By Robert McKirgan, Jennifer Lee-Cota, Heather Robles, Lawrence Kasten
*Counsel for Defendants/Appellees*

**MEMORANDUM DECISION**

Judge Jennifer M. Perkins delivered the decision of the Court, in which Presiding Judge Michael S. Catlett and Judge Angela K. Paton joined.

**P E R K I N S**, Judge:

¶1 Melissa Smith appeals from the superior court's entry of summary judgment and from an award of attorney fees in favor of Morgan and Beth Olsen (collectively "Morgan"). For the following reasons, we affirm the entry of summary judgment and vacate the attorney fee award.

## FACTS AND PROCEDURAL BACKGROUND

¶2 The current case arises from Smith's efforts to recover on a judgment she obtained against Blair Olsen ("Blair") in a separate case. Blair is Morgan's brother. In that case, Smith sued Blair in June 2017 for breach of an easement and other claims. In 2022, Smith obtained a $3,000,000 judgment against Blair, which this Court reduced to $2,115,367 on appeal. *Smith v. Olsen*, 257 Ariz. 518, 625, ¶ 61 (App. 2024). Smith then initiated a fraudulent transfer suit against both Blair and Morgan, seeking to recover assets that Blair inherited from their father ("Father"). The fraudulent transfer claims are based on the following facts.

### A. The Will

¶3 Father died in 2015. His estate contained properties in Mohave County ("Mohave Property"), properties in Maricopa County ("Maricopa Property"), two properties in North Dakota ("Bismarck House" and "Judy Jo Ranch"), and other non-real estate assets. Father's will ("the Will") appointed Morgan as personal representative, devised the Judy Jo Ranch to Blair, and devised the remainder of the estate to Blair and Morgan in equal shares.

### B. The Family Settlement Agreement

¶4 In December 2018, before the estate had been distributed, Morgan and Blair entered into the Family Settlement Agreement ("FSA") agreeing to rearrange how the estate would be distributed. They stipulated to each estate asset's value at the time of Father's death as follows:

- Mohave Property: $29,712

- Maricopa Property: $353,360

- Judy Jo Ranch: $164,500

- Bismarck House: $198,200

- Non-real estate assets: $513,882

Based on those valuations, Blair's inheritance was worth $712,077, and Morgan's was worth $547,577.

¶5            Blair agreed to "release any claim he ha[d]" to the Bismarck House and the Judy Jo Ranch and transfer them to Morgan. In exchange, Morgan agreed to "release any claim he ha[d]" to the Maricopa Property and transfer it to Blair along with $86,920 of the non-real estate assets. In terms of value, Morgan received Blair's one-half interest in the Bismarck House, worth $99,100, and Blair's full interest in the Judy Jo Ranch, worth $164,500. Blair received Morgan's one-half interest in the Maricopa Property worth $176,680 and $86,920 of non-real estate assets. So, based on the FSA's valuations, both parties transferred $263,600 in assets, meaning Blair's inheritance was still worth $712,077, and Morgan's was still worth $547,577 after the FSA.

## C. The distribution of the estate

¶6            In January 2019, Blair emailed Morgan, requesting that the Maricopa Property and his one-half interest in the Mohave Property be transferred to Blair's LLC—Snyder Solutions Animal Rescue & Conservation Group ("Snyder"), instead of transferring it to him personally as set out in the FSA. Blair was the sole incorporator of Snyder and served as its president and director. Morgan, in his capacity as personal representative, transferred the Maricopa Property and a one-half interest in the Mohave Property to Snyder by deed. Then, consistent with the FSA, Morgan transferred a one-half interest in the Mohave Property, the Judy Jo Ranch, and the Bismarck House to himself by deed. Blair and Morgan each personally received the agreed upon amount of non-real estate assets, including the $86,920 that Morgan transferred to Blair under the FSA.

## D. Smith's fraudulent transfer lawsuit

¶7            Smith brought two claims under Arizona's version of the Uniform Fraudulent Transfer Act ("the Act"). *See* A.R.S. §§ 44-1001 to 44-1010. In Count I, she alleged that Blair had fraudulently transferred the Maricopa Property and his interest in the Mohave Property to Snyder. She requested a ruling avoiding the transfers to Snyder to the extent necessary to satisfy her judgment against Blair. In Count II, Smith alleged that Blair had fraudulently transferred the Judy Jo Ranch and one-half of the Bismarck House to Morgan. She requested a judgment against Morgan awarding her the value of that real estate.

¶8        Morgan moved to dismiss. The court denied the motion, but found that Count I did not apply to Morgan, because Snyder, not Morgan, received the Arizona properties. The case was then reassigned to a different superior court judge.

¶9        Morgan moved for summary judgment on Count II. Smith filed a response and cross-motion for partial summary judgment. The court granted summary judgment in favor of Morgan on Count II because the Act only applies to transfers of the debtor's property. The court found that here, the North Dakota properties were never the property of Blair, the debtor, because he released any interest in the Bismarck House and the Judy Jo Ranch before the estate transferred those properties to Morgan. Because Blair could not transfer property he never had, the court found the Act did not apply. Alternatively, the court found that Count II failed as a matter of law because Blair received equivalent value in exchange for the North Dakota properties. Finally, the court noted that by seeking to set aside both the transfer of the North Dakota properties to Morgan (in Count II) and the transfer of the Arizona properties to Snyder (in Count I), Smith sought to recover more than Blair's share of the estate, which would constitute a windfall. In a later ruling, the court awarded Morgan $83,282.50 in attorney fees under Arizona Revised Statutes Section 12-349(A)(1) and (3).

¶10        Smith timely appealed, and we have jurisdiction under Section 12-2101(A)(1).

¶11        While this appeal was pending, Count I proceeded to a bench trial. The superior court found that Blair fraudulently transferred the Maricopa Property and his interest in the Mohave Property to Snyder under Section 44-1004. And that Smith may avoid the transfer to the extent necessary to satisfy her judgment or may levy execution on the assets transferred or their proceeds. We take judicial notice of the court's ruling on Count I. *See In re Dependency as to G.K.*, 258 Ariz. 323, 325, ¶ 11 (App. 2024) (appellate courts may take judicial notice of superior court records).

## DISCUSSION

¶12        On appeal, Smith argues the superior court erred by granting summary judgment for Morgan, denying summary judgment for Smith, and awarding Morgan attorney fees.

### I. Summary judgment

¶13        Summary judgment is appropriate "if the moving party shows that there is no genuine dispute as to any material fact and the

moving party is entitled to judgment as a matter of law." Ariz. R. Civ. P. 56(a). "We review a grant of summary judgment *de novo*, viewing the facts in the light most favorable to the non-moving party." *Dabrowski v. Bartlett*, 246 Ariz. 504, 512, ¶ 17 (App. 2019).

**¶14**        Under Section 44-1004(A), "a transfer made . . . by a debtor is fraudulent . . . if the debtor made the transfer" either "with actual intent to hinder, delay or defraud any creditor of the debtor" or "without receiving a reasonably equivalent value in exchange for the transfer or obligation." (cleaned up). Under Section 44-1005, a transfer made by a debtor is fraudulent if the debtor made the transfer "without receiving a reasonably equivalent value in exchange" and the debtor was insolvent.

### A. Blair transferred the North Dakota properties to Morgan.

**¶15**        Smith argues the superior court erred by finding that Blair did not transfer the North Dakota properties to Morgan under Section 44-1004(A). We agree.

**¶16**        To bring a claim under Sections 44-1004(A) and -1005, "the transfer must be made by the debtor." *SPQR Venture, Inc. v. Robertson*, 237 Ariz. 270, 273, ¶ 14 (App. 2015). The Act defines "transfer" to include "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset and includes payment of money, release, lease and creation of a lien or other encumbrance." A.R.S. § 44-1001(9). The Act also instructs that "[a] transfer is not made until the debtor has acquired rights in the asset transferred." A.R.S. § 44-1006(4).

**¶17**        The court found that the Bismarck House and the Judy Jo Ranch were never Blair's property to transfer, because, by signing the FSA, Blair "released any claim or interest he had" in those properties before the estate transferred them to Morgan. But the definition of "transfer" under the Act explicitly includes the "release" of "an interest in an asset." A.R.S. § 44-1001(9). Thus, under the plain language of the Act, Blair's release of his interest in the North Dakota properties was a transfer.

**¶18**        Morgan argues no transfer occurred because Blair and Morgan only exchanged expectant interests in properties, not actual ownership. But the Act's language is not so narrow. The Act applies to the transfer of "an asset *or an interest in* an asset." *Id.* (emphasis added). And a debtor need not have acquired the asset to transfer it, only "*rights in* the asset." A.R.S. § 44-1006(4) (emphasis added). In the FSA, Blair transferred

5

to Morgan his right to inherit the North Dakota properties. The court erred by finding that the exchange was not a transfer under Section 44-1004(A).

### B. Morgan was entitled to summary judgment even though Blair transferred the North Dakota properties to Morgan.

¶19 Although Morgan was not entitled to summary judgment on the basis that Blair did not transfer the properties, "[w]e will affirm a grant of summary judgment if the [superior] court was correct for any reason." *Federico v. Maric*, 224 Ariz. 34, 36, ¶ 7 (App. 2010). Morgan was entitled to summary judgment if there was no genuine dispute that Blair (1) received reasonably equivalent value in exchange for the North Dakota properties, *see* A.R.S. §§ 44-1004(A)(2), -1005, and (2) did not have actual intent to hinder, delay, or defraud Smith in making the transfer. *See* A.R.S. § 44-1004(A)(1).

¶20 Smith argues that Blair did not receive equivalent value in exchange for transferring to Morgan his right to inherit the Judy Jo Ranch and one-half of the Bismarck House. *See* A.R.S. §§ 44-1004(A)(2), -1005. In return, Blair received one-half of the Maricopa Property and $86,920 in non-real estate assets. The FSA valued the assets on either side of that exchange at $263,600. Smith does not dispute those valuations. Instead, she argues that Blair did not actually receive the Maricopa Property in the exchange because it was ultimately transferred to Snyder, not Blair. And thus the $86,920 of non-real estate assets Blair received was not reasonably equivalent to the value of the North Dakota properties he transferred to Morgan.

¶21 The superior court correctly rejected that argument in granting summary judgment for Morgan on Count II, finding that the exchange "did not reduce the value [Blair] was entitled to receive from the Estate." After signing the FSA, Blair had the right to inherit the Maricopa Property, and Morgan had the right to inherit the North Dakota properties. What Blair did with his interest in the Maricopa Property from then on had no bearing on Morgan's interest in the North Dakota properties. The transaction was already complete. Thus, there is no genuine dispute that Blair received equivalent value in return for the North Dakota properties. Smith's Section 44-1004(A)(2) and -1005 claims fail as a matter of law.

¶22 Smith next argues that Blair made "the transfers" with "actual intent" to hinder, delay, or defraud Smith. *See* A.R.S. § 44-1004(A)(1). She argues that Blair's intent to defraud is evidenced by his transfer of assets to Snyder without receiving reasonably equivalent value. But again, Count II

alleged that Blair fraudulently transferred the North Dakota properties to Morgan. Whether Blair's subsequent transfer of different assets to Snyder was done with the intent to defraud has no bearing on the prior exchange with Morgan.

**¶23**     Smith argues, for the first time on appeal, that we should follow precedents from other Uniform Fraudulent Transfer Act jurisdictions, and consider Blair and Morgan's exchange under the FSA and the subsequent transfer to Snyder as components of a single transaction—the collapsed transaction doctrine. Under that doctrine, in "appropriate circumstances," courts may treat multilateral transactions "as phases of a single transaction." *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 635 (2d Cir. 1995); *see also In re Syntax-Brillian Corp.*, 573 Fed.Appx. 154, 159–60 (3d Cir. Aug. 11, 2014) ("The collapsing doctrine [is] an equitable tool by which a court may collapse multiple apparently innocuous transactions for purposes of a fraudulent transfer analysis and consider the economic reality of the integrated whole." (cleaned up)); *Mills v. Everest Reinsurance Co.*, 410 F. Supp. 2d 243, 254–55 (S.D.N.Y. 2006) ("Courts have collapsed a series of transfers to assess the existence of fair consideration." (cleaned up)). Because Smith did not raise this legal theory in superior court, it is waived on appeal. *BMO Harris Bank, N.A. v. Espiau*, 251 Ariz. 588, 593–94, ¶ 25 (App. 2021) ("[L]egal theories must be presented timely to the trial court so that the court may have an opportunity to address all issues on their merits.").

**¶24**     We will not disturb the superior court's grant of summary judgment in favor of Morgan and denial of Smith's cross-motion for summary judgment.

## II. Attorney fee award

**¶25**     We review an award of attorney fees under Section 12-349 for an abuse of discretion. *Phoenix Mot. Co., Inc, v. Rajabian*, __ Ariz. __, __, ¶ 32, 579 P.3d 1269, 1276 (App. 2025). We defer to the superior court's findings of fact unless clearly erroneous, but we review the court's interpretation and application of Section 12-349 *de novo*. *Ariz. Republican Party v. Richer*, 257 Ariz. 237, 242, ¶ 10 (2024).

**¶26**     The superior court awarded fees against Smith as a sanction under Section 12-349(A)(1) and (3), which provides that "the court shall assess reasonable attorney fees [and] expenses . . . against an attorney or party . . . if the attorney or party . . . brings or defends a claim without substantial justification . . . [or] unreasonably expands or delays the

proceeding."(cleaned up). The court must "set forth the specific reasons for the award." A.R.S. § 12-350.

¶27     Section 12-349(A)(1) requires a showing that the claim was both "groundless" and "not made in good faith." A.R.S. § 12-349(F); *Richer*, 257 Ariz. at 243, ¶ 14. A claim is groundless if there is "no rational argument based upon the evidence or law in support of that claim." *Richer*, 257 Ariz. at 243, ¶ 15.

¶28     The court ruled that Smith's claim was groundless because the record showed that Blair, the debtor, did not make a transfer, as is required to bring claims under Sections 44-1004(A) and -1005. As explained above, Blair did make a transfer within the meaning of the Act. Thus, the court abused its discretion by imposing sanctions under Section 12-349(A)(1).

¶29     Turning to Section 12-349(A)(3), the relevant inquiry is whether a party's or attorney's actions caused an unreasonable delay or expansion of the proceedings. *Solimeno v. Yonan*, 224 Ariz. 74, 81, ¶ 32 (App. 2010). The court found: "[W]hen the discovery turned up no admissible evidence to support her fraudulent transfer claim against Morgan . . . Smith unreasonably expanded and delayed the proceeding by opposing the Motion for Summary Judgment." In other words, the court found that Smith unreasonably delayed the proceeding merely by opposing summary judgment. That is inherently a finding that Smith's claim is groundless. Such a finding was an abuse of discretion for the reasons we have explained. Thus, imposing sanctions under Section 12-349(A)(3) was also an abuse of the court's discretion. *See generally Richer*, 257 Ariz. at 251, ¶ 49 ("By sanctioning parties and their lawyers for bringing debatable, long-shot complaints, courts risk chilling legal advocacy and citizens raising questions under the guise of defending the rule of law." (cleaned up)).

¶30     The court erred in sanctioning Smith under Section 12-349(A)(3) for another reason. The superior court judge previously assigned to this case denied Morgan's motion to dismiss Count II, thereby allowing Smith to litigate that claim and advance the argument that Blair made the necessary transfer under the Act. In its attorney fee ruling, the court then sanctioned Smith for continuing to litigate her claim against Morgan. In essence, the court faulted Smith for failing to voluntarily dismiss her claim because—in the court's view—Blair had not made the necessary transfer. In other words, the court accepted Smith's argument at the motion to dismiss stage but then sanctioned her for making the same argument at the summary judgment stage. Although there may be

circumstances when sanctions under Section 12-349(A)(3) are appropriate even after a party's claim survives a motion to dismiss, based on the record here, the court erred by sanctioning a party for making an argument we have concluded was correct.

## III. Attorney fees and costs on appeal

**¶31**　　　　Morgan requests an award of attorney fees on appeal under Section 12-349 and ARCAP 25, arguing that Smith's appeal lacks substantial justification. Though we affirm the entry of summary judgment, Smith's appeal identified a flaw in the superior court's summary judgment analysis, and the court abused its discretion in awarding attorney fees. We decline to award Morgan attorney fees on appeal.

**¶32**　　　　Both parties request their taxable costs on appeal under Section 12-341. Because we affirm the summary judgment ruling but vacate the attorney fee award, neither party was "successful" under Section 12-341. We thus decline to award costs to either party under Section 12-341. *See Lee v. ING Inv. Mgmt., LLC*, 240 Ariz. 158, 163, ¶ 22 (App. 2016).

**¶33**　　　　Smith also requests costs under Section 12-342, which permits a party to recover costs on appeal from a judgment against her, if the "judgment of the appellate court is against [her], but for a lesser amount." A.R.S. § 12-342(A). Here, there was a judgment against Smith in superior court entering summary judgment against her and ordering her to pay $83,282.50 in attorney fees. We now affirm the superior court's judgment entering summary judgment against Smith but reduce her attorney fee obligation from $83,282.50 to $0. Accordingly, there is still a judgment "against [Smith], but for a lesser amount." *See* A.R.S. § 12-342(A). We thus award Smith her taxable costs on appeal under Section 12-342.

## CONCLUSION

**¶34**　　　　We affirm the entry of summary judgment in favor of Morgan. We vacate the court's award of attorney fees.



**MATTHEW J. MARTIN • Clerk of the Court**
**FILED**:　　　　JR