IN THE

# ARIZONA COURT OF APPEALS

DIVISION TWO

---

LORI SANDRETTO, A SINGLE WOMAN,
*Plaintiff/Appellee,*


*v.*


PAYSON HEALTHCARE MANAGEMENT, INC. an Arizona corporation,
dba PAYSON REGIONAL BONE & JOINT,
*Defendant/Appellant.*


No. 2 CA-CV 2013-0044
Filed March 11, 2014

---


Appeal from the Superior Court in Gila County
No. CV2010-00115
The Honorable Gary V. Scales, Judge

**AFFIRMED**

---

COUNSEL

Lloyd & Robinson, PLLC, Payson
By Arthur E. Lloyd and Doris Robinson Wait

and

McGovern Law Offices, Phoenix
By Thomas P. McGovern

and

Law Office of Scott E. Boehm, P.C., Phoenix
By Scott E. Boehm
*Counsel for Plaintiff/Appellee*

Law Offices of Don Stevens, P.C., Phoenix
By Don Stevens
*Counsel for Defendant/Appellant*

---

**OPINION**

---

Judge Miller authored the opinion of the Court, in which Presiding Judge Vásquez and Chief Judge Howard concurred.

---

M I L L E R, Judge:

**¶1** Payson Healthcare Management (PHM) appeals from the trial court's denial of its motion for new trial after a medical malpractice case ended in judgment for the appellee, Lori Sandretto. PHM contends the court erred in denying the motion, which included claims the court made erroneous evidentiary rulings, improperly denied a continuance request, and improperly approved a co-defendant's settlement agreement. PHM also argues the court erred in finding the jury verdict was supported by substantial evidence. Finding no error, we affirm.

### Factual and Procedural Background

**¶2** We view the evidence in the light most favorable to upholding the jury's verdict. *Hutcherson v. City of Phoenix*, 192 Ariz. 51, ¶ 13, 961 P.2d 449, 451 (1998). In April 2008, Sandretto slipped on a wet floor and injured her right knee, which eventually required outpatient surgery by a non-party physician to repair a torn meniscus. Sandretto's pain continued, which prompted her to see

Dr. Charles Calkins, an orthopedic surgeon with thirty-five years of experience. Calkins was employed by PHM. He found that the meniscus was still torn and performed a second surgery on September 5, 2008. Calkins removed fluid from the knee during surgery for testing, which was subsequently negative for infection.

¶3 Sandretto's condition initially improved, but within a week her knee became swollen, red, and painful. She was examined by James Morphis, a physician's assistant (PA) for Calkins. Morphis prescribed antibiotics for a skin infection. On September 14, 2008, Sandretto went to the emergency room. Calkins came to the hospital, diagnosed her with a common skin infection and prescribed a different antibiotic. Five days later, Sandretto called Calkins's office to say her knee still hurt and was now draining fluid. Morphis told a staff member to tell Sandretto to keep taking antibiotics.

¶4 Sandretto saw Morphis again on September 24, 2008, and still believed she had a skin infection. On October 10, 2008, Morphis aspirated Sandretto's knee and had the fluid tested. Three days later, the results came back positive for methicillin-resistant Staphylococcus aureus (MRSA).[1] Calkins did not recall being told about the results, but records showed he wrote a prescription for intravenous antibiotics. Sandretto eventually saw Calkins on October 22, 2008, and he performed a surgery on October 24, 2008, to wash out the MRSA. Sandretto required two more "washout" surgeries, and eventually needed a knee replacement. Her knee pain continued despite the knee replacement, and her treating physician diagnosed her with Complex Regional Pain Syndrome (CRPS), a chronic pain condition caused by a nerve injury.

¶5 In 2010, Sandretto sued Calkins and PHM for medical malpractice, alleging Calkins did not act quickly enough to diagnose and treat the MRSA infection, thus necessitating aggressive medical

---

[1]MRSA is an infection that destroys tissue and, when found in a joint, requires high doses of antibiotics as well as surgery to wash it out.

treatments that resulted in permanent impairment. Calkins and Sandretto settled days before trial. After an eleven-day trial, the jury returned a verdict in favor of Sandretto for $7,275,160. Having filed an offer of judgment before trial, Sandretto sought and was granted sanctions pursuant to Rule 68, Ariz. R. Civ. P.

¶6            The trial court entered judgment on October 3, 2012, and PHM subsequently moved for a new trial. After a hearing, the court denied the motion. This timely appeal followed.

## Discussion

**Scope and standard of review on appeal**

¶7            We first note that PHM's notice of appeal only seeks review "from the Order of the Gila County Superior Court, made and entered on the 19th day of February, 2013, denying the Motion for New Trial filed by [PHM]." Further, PHM properly invokes this court's jurisdiction pursuant to A.R.S. § 12-2101(A)(5)(a). The notice does not appeal from the final judgment as permitted by A.R.S. § 12-2101(A)(1). In its briefs, however, PHM raises arguments not made in its motion for a new trial. Because PHM did not appeal separately the underlying judgment, we must limit our review to issues raised in the Rule 59, Ariz. R. Civ. P., motion.[2] *See Wendling v. Sw. Sav. and Loan Ass'n*, 143 Ariz. 599, 601, 694 P.2d 1213, 1215 (App. 1984); *Matcha v. Winn*, 131 Ariz. 115, 116, 638 P.2d 1361, 1362 (App. 1981) ("[I]n reviewing the denial of a motion for new trial, this court may not go beyond the matters assigned as error in the motion.").

¶8            Generally, we review a trial court's decision to deny a motion for a new trial for an abuse of discretion, and the burden is on the party seeking to overturn the trial court's judgment to show such an abuse. *See Pullen v. Pullen*, 223 Ariz. 293, ¶ 10, 222 P.3d 909, 912 (App. 2009). Similarly, we review rulings on admissibility of testimony, motions to continue, and petitions to approve settlement for an abuse of discretion, as discussed further below. *See Pipher v.*

---

[2]The issues excluded on appeal include the sanctions imposed pursuant to Rule 68, Ariz. R. Civ. P.

*Loo*, 221 Ariz. 399, ¶ 6, 212 P.3d 91, 93 (App. 2009) (testimony); *Alberta Sec. Comm'n v. Ryckman*, 200 Ariz. 540, ¶ 11, 30 P.3d 121, 124 (App. 2001) (motions to continue); *Barmat v. John & Jane Doe Partners A-D*, 165 Ariz. 205, 210, 797 P.2d 1223, 1228 (App. 1990) (settlement agreements). A trial court abuses its discretion if it commits an error of law reaching a discretionary conclusion; therefore, we review de novo questions of law that were included in the motion for new trial. *See Twin City Fire Ins. Co. v. Burke*, 204 Ariz. 251, ¶ 10, 63 P.3d 282, 284 (2003).

**Admissibility of expert medical testimony**

**¶9** PHM argues the testimony of Dr. Michael Ferrante, one of Sandretto's expert witnesses, should have been precluded pursuant to Rule 702, Ariz. R. Evid. Ferrante opined that Sandretto suffered from CRPS caused by one or more of the surgical procedures required to clean out the MRSA infection and to replace Sandretto's knee. His opinion complemented the testimony of Sandretto's MRSA expert, Dr. Talan, who testified to the deleterious effects of MRSA and its treatment, unnecessary damage caused by the late diagnosis, and his opinion about the date of infection. Taken together, the testimony of Ferrante and Talan permitted the jury to construct a cause-and-effect timeline regarding MRSA, multiple surgeries, and CRPS.

**¶10** PHM contends Ferrante's diagnosis of CRPS and his causation opinion lacked "reliable or scientific[]" grounds.[3] This argument requires us to examine the gate-keeping function of Rule 702 as it pertains to the opinions of an examining physician.

---

[3]PHM also appears to argue the trial court made a procedural error when it did not make a record of its inquiry or specific findings of fact to support its ruling under Rule 702, Ariz. R. Evid. PHM did not contend in its motion for a new trial that the court erred procedurally, noting only that "the Court recognized that it was required to be the gatekeeper," pursuant to Rule 702. We will not address this new argument on appeal from the denial of the motion for a new trial. *See Matcha*, 131 Ariz. at 116, 638 P.2d at 1362.

**¶11**　　　　We review the trial court's decision to admit or exclude expert testimony for an abuse of discretion. *See Pipher*, 221 Ariz. 399, ¶ 6, 212 P.3d at 93. The admissibility of expert testimony is governed by Rule 702, which was amended effective January 1, 2012 to adopt the language of Rule 702, Fed. R. Evid., and to reflect the principles set forth in *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *See State v. Salazar-Mercado*, 232 Ariz. 256, ¶ 5, 304 P.3d 543, 546 (App. 2013); *see also* Ariz. R. Evid. 702 cmt. We construe the amended Arizona rule in accordance with its federal counterpart. *Ariz. State Hospital/Ariz. Cmty. Protection & Treatment Ctr. v. Klein*, 231 Ariz. 467, ¶ 26, 296 P.3d 1003, 1009 (App. 2013); *see also* Ariz. R. Evid. Prefatory Cmt. to 2012 Amendments ("Where the language of an Arizona rule parallels that of a federal rule, federal court decisions interpreting the federal rule are persuasive but not binding . . . .").

**¶12**　　　　Rule 702 as amended sets out four requirements that must be met before an expert witness may testify in the form of an opinion or otherwise, and states in its entirety:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Ariz. R. Evid. 702. *Daubert* offers additional "non-exclusive factors for determining whether scientific evidence is admissible," including empirical testing, peer review, error rate, the existence of standards and controls, and the degree to which the theory and technique is generally accepted by a relevant scientific community. *Ariz. State Hosp.*, 231 Ariz. 467, ¶ 27, 296 P.3d at 1009; *see also Daubert*, 509 U.S. at 593-94.

¶13 Application of the *Daubert* factors, however, particularly to medical testimony like that of Ferrante, requires flexibility. *See Sullivan v. U.S. Dept. of Navy*, 365 F.3d 827, 834 (9th Cir. 2004) (when medical testimony in malpractice case "based on specialized as distinguished from scientific knowledge, the *Daubert* factors are not intended to be exhaustive or unduly restrictive"); *see also Huss v. Gayden*, 571 F.3d 442, 455 (5th Cir. 2009) (*Daubert* standards flexible). Although grounded in science, medicine is a profession that requires physicians to rely on their previous experiences and sound judgment. *Cf. Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) (finding experience-based physician testimony admissible in products liability action). Moreover, federal appellate courts have cautioned against the exclusion of medical testimony based on factors more relevant in a product liability case. The Sixth Circuit explained:

> *Daubert's* role of "ensur[ing] that the courtroom door remains closed to junk science" . . . is not served by excluding [physician] testimony . . . that is supported by extensive relevant experience. Such exclusion is rarely justified in cases involving medical experts as opposed to supposed experts in the area of product liability.

*Dickenson v. Cardiac & Thoracic Surgery of E. Tenn.*, 388 F.3d 976, 982 (6th Cir. 2004), *quoting Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002).

¶14 Arizona's adoption of the language of the federal rule included a caution that the amendment "is not intended to . . .

preclude the testimony of experience-based experts." Ariz. R. Evid. 702 cmt.; *see also McMurtry v. Weatherford Hotel, Inc.*, 231 Ariz. 244, ¶ 17, 293 P.3d 520, 527 (App. 2013). The advisory committee note to Federal Rule 702—from which Arizona's 2012 comment is derived— similarly explains, "Nothing in this amendment is intended to suggest that experience alone—or experience in conjunction with other knowledge, skill, training or education—may not provide a sufficient foundation for expert testimony."

**¶15**　　　　Although the application of new Rule 702 to expert medical opinions requires flexibility, it has long been true that the proponent has the burden of showing the expert's qualifications are relevant to particular issues in the case. *See, e.g.*, *Gaston v. Hunter*, 121 Ariz. 33, 51, 588 P.2d 326, 344 (App. 1978) (witness must be "competent to give an expert opinion on the precise issue about which he is asked to testify"). The qualification requirement continues under amended Rule 702. *See, e.g.*, *State v. Delgado*, 232 Ariz. 182, ¶ 12, 303 P.3d 76, 80-81 (App. 2013) (medical doctor with extensive experience in emergency medicine had expertise to opine whether victim's injuries were consistent with strangulation). Ferrante testified in detail about his background, as well as how and why he had diagnosed Sandretto with CRPS. He is the chief of pain medicine at the University of California, Los Angeles Medical School and a professor of internal medicine and anesthesiology. Ferrante has extensive experience with CRPS, a condition recognized by the American Medical Association and taught at medical schools.

**¶16**　　　　While implicitly acknowledging Ferrante might be a national expert on CRPS, PHM argues the trial court abused its discretion by failing to evaluate the scientific basis for Ferrante's opinions regarding CRPS, as well as by admitting his causation opinion. PHM also contends the court should have conducted a *Daubert* hearing before trial and precluded the testimony.

**¶17**　　　　As a procedural matter, we first observe a trial court has great discretion whether to set a pretrial hearing to evaluate proposed expert testimony. *Ariz. State Hosp.*, 231 Ariz. 467, ¶ 31, 296 P.3d at 1010. The court may properly decide to hear the evidence and objections during the trial. *Id.* Here, PHM filed a pretrial brief

that broadly questioned whether opinions about CRPS could be stated to a reasonable degree of medical probability. It requested the court determine which CRPS testimony would be offered and whether it would be admissible under Rule 702. PHM did not appear to request a separate hearing. But assuming arguendo it had, in the context of a general challenge under Rule 702, we have no reason to conclude the court abused its discretion to defer hearing the objection until trial.

¶18 PHM's substantive challenge to the scientific basis and reliability of Ferrante's causation opinion was based on certain facts[4] to demonstrate generally, and specific to Sandretto's condition, that the trial court should have precluded the causation opinion pursuant to Rule 702. Whether the trial court abused its discretion in admitting the causation opinion requires us to examine the grounds for it.

¶19 To diagnose Sandretto, Ferrante had her fill out the "McGill Pain Questionnaire," from which he concluded she had nerve-related pain. He also performed a neurological exam which showed increased sensitivity and a bone scan which "li[t] up" in the affected area. Ferrante concluded she suffered from CRPS Type I, with "Type I" indicating that he could not identify which specific nerve had been injured.[5]

¶20 In his CRPS causation opinion, Ferrante explained the "unifying factor" was MRSA because the surgeries that followed the diagnosis would not have been required without the MRSA

---

[4] PHM's proffered facts, disputed by Sandretto, can be summarized as follows: CRPS is a not-well-understood pain syndrome caused by traumatic damage to one or more nerves; further, it is not caused by infection and can change over time.

[5] PHM also appears to argue that Ferrante had no basis for his diagnosis because he could not identify which nerve was damaged. It concedes, however, that CRPS Type I is a valid diagnosis when a specific nerve cannot be identified.

infection. Ferrante further testified that CRPS is caused by trauma; surgery is a traumatic injury; therefore, "more likely than not," it was one of the surgeries after the MRSA diagnosis that caused the CRPS. He further ruled out Calkins's surgery to repair the meniscus because Sandretto "got better for a few days then the bad spiral began." Ferrante did not link the CRPS to any negligence by PHM. That connection was made through Talan's testimony that the more time a MRSA infection has to progress before the first wash-out surgery, the more damage is done to the joint, and "probably the more surgeries you're going to need to get it cleaned out completely."[6]

¶21 PHM argues Ferrante's causation opinion was "medical mumbo-jumbo" and "rank speculation" that "Rule 702 was designed to prevent." It relies on *Black v. Food Lion, Inc.*, 171 F.3d 308, 314 (5th Cir. 1999), for the proposition that a pain syndrome without a clear genesis requires "critical scientific predicates" rather than a "general methodology." In *Black*, the plaintiff's medical expert rendered her causation opinion based on the absence of symptoms in plaintiff's pre-accident medical history and a lack of

---

[6]PHM notes it is undisputed the standard of care requires a washout procedure once MRSA is detected and contends this and other facts are "fatal to [Sandretto's] causation theory," because Ferrante could not pinpoint exactly which surgery caused the CRPS. To the extent PHM is arguing the trial court should have granted its motion for new trial on this basis, the argument is waived because it is not clearly raised and argued on appeal. *See Lohmeier v. Hammer*, 214 Ariz. 57, n.5, 148 P.3d 101, 108 n.5 (App. 2006). Further, on review of the denial of a motion for new trial we will not reweigh the evidence "'merely because the jury could have drawn different inferences or conclusions or because [we] feel that other results are more reasonable.'" *Hutcherson v. City of Phoenix*, 192 Ariz. 51, ¶ 27, 961 P.2d 449, 454 (1998), *quoting Tennant v. Peoria & Pekin Union Ry. Co.*, 321 U.S. 29, 35 (1944). Finally, PHM does not challenge the sufficiency of the evidence, only its admissibility.

intervening events to account for her fibromyalgia.[7] *Id.* at 313. The Fifth Circuit found the trial court failed to apply *Daubert* criteria, which would have shown no support by researchers or the medical literature that trauma causes fibromyalgia. *Id.* at 312-14. The appellate court quoted at length recent medical articles and a "Consensus Report" evaluating experimental data on trauma and fibromyalgia. *Id.* The scientific literature showed no causal connection, which allowed the court to conclude the expert's theory of causation had not been "verified or generally accepted" and had "no known potential rate of error." *Id.* at 313. Even the plaintiff's expert conceded she could not identify a cause, but instead "found an event that contributed to the development of the symptom." *Id.*

¶22 PHM's reliance on *Black* is misplaced for a number of reasons. First, one disease, such as fibromyalgia, is not the functional equivalent of another. More important, PHM did not present to the trial court in its Rule 702 motion scientific literature undermining the reliability or application of Ferrante's causation opinion. Instead, PHM relied on two medical information sheets from the internet.[8] Both documents included disclaimers that the information could not be used for the diagnosis or treatment of any medical condition. The information sheets were unsigned and without endorsement by a recognized body; moreover, there was no suggestion that the information represented a consensus in the pain management field.

¶23 When examined about the information sheets, Ferrante testified that the molecular mechanism of CRPS is not clearly understood, but the medical cause, traumatic injury, was well documented. When a properly qualified physician with expertise in

---

[7] Although PHM initially argued fibromyalgia was "another name for CRPS," it acknowledged the error in its Reply Brief, but contended an analogy remains because fibromyalgia "is another syndrome about which medical science knows very little."

[8] *See, e.g.,* www.ninds.nih.gov/disorders/reflex_sympathetic_dystrophy/reflex_sympathetic_dystrophy.htm (last visited March 4, 2014).

a recognized medical condition opines on the cause of the condition in a particular patient based on his examination and testing, such testimony is admissible unless the opponent proffers scientific evidence challenging the reliability of the underlying principles and application. *See* Ariz. R. Evid. 702 cmt.; *Huss*, 571 F.3d at 455. Reliance on internet-based general medical information with disclaimers against using the information for medical diagnosis and treatment does not satisfy this requirement.

**¶24** Finally, PHM's challenge of Ferrante's testimony based on isolated portions of his testimony and the testimony of PHM's expert does not present a Rule 702 argument; rather, it is a jury argument going to the weight and credibility of the testimony. *See* Ariz. R. Evid. 702 cmt. ("Where there is contradictory, but reliable, expert testimony, it is the province of the jury to determine the weight and credibility of the testimony."); *see also Pipher*, 221 Ariz. 399, ¶ 17, 212 P.3d at 96. "No rule is better established than that the credibility of the witnesses and the weight and value to be given to their testimony are questions exclusively for the jury." *State v. Clemons*, 110 Ariz. 555, 556-57, 521 P.2d 987, 988-89 (1974). As the First Circuit observed in a medical malpractice action with competing expert opinions, the trial court's "gatekeeping function ought not to be confused with the jury's responsibility to separate wheat from chaff." *Crowe v. Marchand*, 506 F.3d 13, 18 (1st Cir. 2007). Here, the jury properly was allowed to evaluate the differing opinions of the experts based on reasons given for them. We conclude the trial court did not abuse its discretion by admitting Ferrante's diagnosis of CRPS and his causation opinion.

**Preclusion of evidence of prior medical conditions**

**¶25** PHM next argues the trial court erred when it precluded evidence of Sandretto's prior medical conditions on the basis of Rule 403, Ariz. R. Evid., and when it failed to make specific findings supporting its Rule 403 balancing. As explained below, neither argument is sufficiently presented for our review.

**¶26** Before and during trial, PHM requested that it be allowed to question witnesses about Sandretto's prior medical history, including her history of pain and emotional issues.

Sandretto filed four motions in limine to limit testimony regarding those issues. PHM also filed an offer of proof listing sixty-one facts it sought to have admitted. On appeal, PHM cites to the offer of proof and items contained in the four motions in limine as evidence it sought to have admitted, and contends the preclusions "unfairly limited PHM's cross examination of Plaintiff and her experts." It is apparent from the trial record, however, that much of that evidence was actually admitted. PHM does not list specific items that should have been admitted but were not, nor does PHM analyze why the relevance of those individual items or categories of items was not outweighed by the danger of unfair prejudice pursuant to Rule 403. Thus, we find the argument insufficient for our consideration on appeal. *See Adams v. Valley Nat'l Bank of Ariz.*, 139 Ariz. 340, 343, 678 P.2d 525, 528 (App. 1984) (appellate court cannot assume duty of advocate and search voluminous records to support argument on appeal).

¶27      PHM's second argument regarding Rule 403 is procedural. It contends the trial court should have made "findings about the factors [it] used in striking the proper [Rule 403] balance." Here, again, we cannot determine which evidentiary items were precluded without specific citations to the record. PHM does not direct us to the rulings, cite to transcripts, or even provide the transcripts for every instance in which the court considered whether or not to admit the evidence. Consequently, we will not consider this issue on appeal. *See Adams*, 139 Ariz. at 343, 678 P.2d at 528.

**Foundation for future care testimony**

¶28      PHM argues Sandretto's expert Loretta Lukens did not provide proper foundation to testify about the cost of Sandretto's future medical care. More specifically, it contends Ferrante should have testified at trial that each specific element of the life care plan was medically necessary. We review the admission of evidence for an abuse of discretion. *See Pipher*, 221 Ariz. 399, ¶ 6, 212 P.3d at 93.

¶29      Rule 703, Ariz. R. Evid., details the proper sources of information for expert opinions. Experts may base their opinions on "facts or data in the case that the expert has been made aware of or personally observed," and facts or data on which "experts in the

particular field would reasonably rely." Ariz. R. Evid. 703; *Standard Chartered PLC v. Price Waterhouse*, 160 Ariz. 6, 44, 945 P.2d 317, 355 (App. 1996). There is no requirement that the facts or data be part of the trial testimony. Ariz. R. Evid. 703; *see also Pipher*, 221 Ariz. 399, ¶ 8, 212 P.3d at 94 (facts or data need not be admissible in evidence).

**¶30**         Lukens testified that she relied on her own observations and experience, as well as input from medical doctors, and readily-available pricing information for procedures, medications, and other line items. She explained she had twenty years experience preparing life care plans. To prepare the plan here, she met with Sandretto and spoke to Ferrante on two occasions. She also spoke to Dr. Stewart Shanfield regarding orthopedic items on the plan. She testified she typically relied on physicians to provide medical justification for individual line items in the life care plan, and then she would determine the cost to build the plan. Regarding the reasonableness of costs, Lukens testified her expertise includes the calculation of the costs of the plan, but the doctors determined whether a particular line item was appropriate. She also testified her methods and life care plan are accepted by those in her field with her level of expertise.

**¶31**         PHM contends the basis for Lukens's life care plan is insufficient because Ferrante testified he did not recall looking at the plan line by line, and in a deposition he said he had not. Lukens, however, testified Ferrante had reviewed it all or she would not have marked it as "reviewed." Any inconsistency in testimony went to its weight, not its admissibility. *See Smith v. Uniroyal, Inc.*, 420 F.2d 438, 442 (7th Cir. 1970) (inconsistency in expert testimony to be considered by jury); Ariz. R. Evid. 702 cmt. ("Where there is contradictory, but reliable, expert testimony, it is the province of the jury to determine the weight and credibility of the testimony."). PHM has failed to show Lukens's testimony was not based on facts or data on which those in her field would reasonably rely.

**¶32**         PHM makes a related challenge to Lukens's testimony based on its conclusion she was not candid in the preparation of her life care plan. But we do not address the accuracy of PHM's characterization because credibility of a witness is a question for the

trier of fact. *See Belliard v. Becker*, 216 Ariz. 356, ¶ 19, 166 P.3d 911, 914 (App. 2007); Ariz. R. Evid. 702 cmt. (recent amendment did not disturb "traditional jury determinations of credibility and the weight to be afforded" testimony). The trial court did not err in admitting Lukens's testimony and life care plan and, therefore, did not err in denying the motion for a new trial on this basis.

**Scope of standard of care opinion**

¶33 PHM argues the trial court abused its discretion in allowing the admission of opinions by Dustyn Severns that had not been properly disclosed before trial. At trial, Severns testified about the standard of care of a PA, stating it required proper communication between a PA and a doctor, and further opining the PA cannot stay quiet if he believes the doctor is letting too much time pass between a MRSA diagnosis and treatment.

¶34 A trial court's decisions regarding alleged disclosure violations will not be disturbed absent an abuse of discretion. *Solimeno v. Yonan*, 224 Ariz. 74, ¶ 9, 227 P.3d 481, 484 (App. 2010). Rule 26.1(a)(6), Ariz. R. Civ. P., requires parties to disclose information about the expert witnesses they expect to call at trial, including a writing detailing "the substance of the facts and opinions to which the expert is expected to testify," and "a summary of the grounds for each opinion." The purpose of the pretrial disclosure rules is "to provide the parties 'a reasonable opportunity to prepare for trial.'" *Breitbart-Napp v. Napp*, 216 Ariz. 74, ¶ 21, 163 P.3d 1024, 1030 (App. 2007), *quoting Bryan v. Riddel*, 178 Ariz. 472, 476 n.5, 875 P.2d 131, 135 n.5 (1994). Detailed scripting is not required, *Solimeno*, 224 Ariz. 74, ¶ 14, 227 P.3d at 484, and deposition testimony may be considered an amendment to prior disclosures, *Link v. Pima Cnty.*, 193 Ariz. 336, ¶ 9, 972 P.2d 669, 672 (App. 1998).

¶35 Severns's pretrial disclosure affidavit did not include a discussion of PA-physician communication protocol and a PA's duty to remind a doctor about a MRSA diagnosis. Rather, it focused more generally on the delay in Sandretto's treatment after the MRSA diagnosis. However, Severns testified about the communication failures during his deposition six months before trial and opined Morphis's failure to communicate with Calkins constituted a

violation of the standard of care. The affidavit and deposition testimony together were detailed enough for PHM to prepare its case. *Cf. Solimeno*, 224 Ariz. 74, ¶ 15, 227 P.3d at 484 (finding insufficient disclosure where doctor would testify to "his care and treatment of [patient] and any conversations he had with [her] . . . [and] his care and treatment . . . complied with the applicable standard of care"); *Englert v. Carondelet Health Network*, 199 Ariz. 21, ¶ 7, 13 P.3d 763, 767 (App. 2000) (affirming grant of new trial on basis of failure to disclose affirmative defense). The trial court did not abuse its discretion in admitting Severns's testimony, nor in refusing to grant a new trial on this basis.

**Calkins's settlement**

*Time allowed for "Good Faith Settlement" hearing*

**¶36**         PHM argues the trial court abused its discretion in denying its motion to continue trial to prepare for a "good faith" settlement hearing regarding Calkins's settlement with Sandretto.

**¶37**         Sandretto and Calkins settled on June 19, 2012, and moved for a good faith settlement hearing the same day. On June 22, PHM moved to continue the trial, in part to determine the extent of liability and the effect of the settlement agreement on the case. On June 25, the court held a hearing, denied the motion to continue, and determined the settlement had been made in good faith. The trial began the next day. PHM never filed a formal objection to the settlement, but made substantive arguments against approval of the settlement during the hearing.

**¶38**         We review the grant or denial of a motion to continue for an abuse of discretion. *Alberta Sec. Comm'n*, 200 Ariz. 540, ¶ 11, 30 P.3d at 124. Rule 16.2(a), Ariz. R. Civ. P., permits a party to petition the court for a "formal determination whether [a] settlement is made in good faith." Pursuant to Rule 16.2(b), any party may file an objection within ten days, although that time period "may be shortened or enlarged by the court." Rule 16.2(c), requires the court to set a hearing date upon the timely request of a party, but does not provide any guidance as to when that hearing may be held.

**¶39**        PHM argues it had ten days to object to the settlement pursuant to Rule 16.2(b), and therefore should have had more time to prepare for the hearing.  The plain language of the rule, however, provides that the trial court may shorten the time to object and sets no boundaries for the hearing itself.  Additionally, PHM provides no authority, nor are we aware of any, for why it should have had more time under Rule 16.2(b) or (c).

**¶40**        PHM admitted during the good faith settlement hearing that its evidence of collusion likely would be limited to the terms of the agreement stating, "[PHM] acknowledge[s] that it would be difficult to interview the lawyers about what they were doing and so [it is] left, then, with arguing on the four corners of the agreement."  At the hearing, PHM had the opportunity to make its substantive arguments that the agreement was collusive, and the trial court stated it had read the pleadings and listened to the argument and concluded the agreement was made in good faith.

**¶41**        PHM has not demonstrated that a continuance would have permitted it to obtain the required evidence or present arguments it had been unable to present.  We cannot say the trial court abused its discretion in refusing to continue trial to allow more time to prepare objections and conduct discovery into the propriety of the settlement.  *See Anderson Aviation Sales Co. v. Perez*, 19 Ariz. App. 422, 428, 508 P.2d 87, 93 (1973) (no abuse of discretion in denying continuance where one of the defense attorneys was disbarred on opening day of trial); *see also Barmat*, 165 Ariz. at 210, 797 P.2d at 1228 (no abuse of discretion in denying further discovery into settlement agreement).

*Vicarious liability claims for Calkins's acts and omissions*

**¶42**        PHM contends the vicarious liability claims based on Calkins's actions should have been dismissed after the trial court

approved the settlement agreement, when PHM moved for judgment as a matter of law.[9]

**¶43**     Although we review the trial court's denial of the motion for a new trial for an abuse of discretion, a court abuses its discretion when it commits an error of law. *Twin City Fire Ins. Co.*, 204 Ariz. 251, ¶ 10, 63 P.3d at 254. We review de novo the denial of a motion for judgment as a matter of law. *Acuna v. Kroack*, 212 Ariz. 104, ¶ 23, 128 P.3d 221, 227 (App. 2006).

**¶44**     Under the terms of the agreement, Calkins's own insurance carrier,[10] which had a $1 million policy limit, would pay $950,000 to Sandretto in exchange for dismissing the claims against Calkins without prejudice and agreeing to a covenant not to execute in his favor. PHM argues the dismissal and covenant constituted a release and compromise of the claims against PHM as well.

**¶45**     PHM relies primarily on *Law v. Verde Valley Med. Ctr.*, 217 Ariz. 92, 170 P.3d 701 (App. 2007), for the proposition that a judgment in favor of an agent, such as Calkins, eliminates vicarious liability for the principal, PHM. In *Law*, the claims against two doctors sued for medical malpractice were dismissed with prejudice.

---

[9]PHM also contends "the trial court abused its discretion by refusing to inform the jury of the fact that Calkins had settled with [Sandretto]." PHM provides no authority for this argument, instead making a substantive argument about whether the claims based on vicarious liability should have been dismissed and whether the agreement was collusive. Accordingly, we do not address this issue. Ariz. R. Civ. App. P. 13(a)(6); *Brown v. U.S. Fidelity & Guar. Co.*, 194 Ariz. 85, ¶ 50, 977 P.2d 807, 815 (App. 1998) (assertion without authority not considered).

[10]The agreement also stated that Calkins was covered under PHM's liability insurance policy, which provided a policy limit of $5 million and covered him whether the individual insurance policy existed or not.

*Id.* ¶¶ 4-6. The trial court also granted summary judgment in favor of the hospital on claims based on the vicarious liability of those doctors. *Id.* ¶ 8. This court concluded summary judgment was proper, relying on *DeGraff v. Smith*, 62 Ariz. 261, 157 P.2d 342 (1945), for the principle that "[w]hen a judgment on the merits—including a dismissal with prejudice—is entered in favor of the 'other person' . . . there is no fault to impute and the party potentially vicariously liable . . . is not 'responsible for the fault' of the other person." *Law*, 217 Ariz. 92, ¶ 13, 170 P.3d at 705, *quoting* A.R.S. § 12-2506(D)(2).

¶46 Here, unlike in *Law*, there was no "judgment on the merits" regarding Calkins. A dismissal without prejudice—even when the statute of limitations has run—is not a dismissal on the merits. *Hovatter v. Shell Oil Co.*, 111 Ariz. 325, 326, 529 P.2d 224, 225 (1974). Additionally, "a covenant not to execute is not a release from liability." *A Tumbling-T Ranches v. Flood Control Dist. of Maricopa Cnty.*, 220 Ariz. 202, ¶ 22, 204 P.3d 1051, 1058 (App. 2008). PHM contends that this is a "legal fiction," but does not provide contrary authority for its position. Neither the dismissal without prejudice nor the covenant not to execute constituted a release from liability. The trial court did not err in denying the motion for judgment as a matter of law and therefore did not abuse its discretion in denying the motion for a new trial on that basis.

*Collusion between Calkins and Sandretto*

¶47 PHM also argues the trial court erred in determining the settlement agreement was not collusive because it allowed Calkins to admit fault and "avoid the consequences of his admission," while leaving PHM to defend the case on the eve of trial.

¶48 We review a trial court's decision to approve a settlement agreement for an abuse of discretion. *See Barmat*, 165 Ariz. at 210, 797 P.2d at 1228. PHM relies on *In re Alcorn*, 202 Ariz. 62, ¶¶ 20-21, 41 P.3d 600, 606 (2002), for the principle that an agreement may be collusive if it deprives the non-settling party of a fair trial by changing the motive or trial tactics in defending the case. In that attorney disciplinary proceeding, our supreme court

19

determined a secret agreement to dismiss the single remaining defendant at the close of the case, during which the defendant's attorney would not object to the scope of inquiry, was collusive. *Id.* ¶¶ 11, 30. It resulted in a "sham" trial in which the parties were not adverse, and the only purpose was to educate the trial judge before he decided a pending motion to reconsider an earlier summary judgment in favor of the other defendant. *Id.* ¶¶ 12, 30. The court concluded any newly-discovered evidence the plaintiffs wanted to present in reconsideration of the motion for summary judgment should have been presented in the motion proceedings, so the other defendant could participate. *Id.* ¶ 32.

**¶49**　　　Here, PHM may not have expected Calkins to settle, but its motive and tactics in defending the case did not change in the manner considered in *Alcorn*. PHM's liability was based on the acts of Calkins and his PA, whether Calkins was a party to the case or not. Further, Calkins did not suddenly cease defending his actions as PHM contends. PHM and Sandretto both contend Calkins changed his testimony between the deposition and the trial, originally stating he was not aware of the MRSA diagnosis until nine days after the results, although neither party indicates where or if the deposition testimony can be found in the record. Even assuming this to be true, Calkins did not reverse course at trial and testify that he remembered the MRSA diagnosis; rather, he said he had no personal recollection of the diagnosis, but the existence of an antibiotic prescription in the chart indicated that he knew earlier than he originally stated in his deposition.[11]

---

[11] At trial, Calkins also admitted that he could not in truthfulness say he met the standard of care given the documented delay in treatment. This admission, however, occurred during PHM's cross examination and PHM did not then challenge this statement as inconsistent with earlier deposition testimony. There is no indication in the briefs or the record that this admission was inconsistent with Calkins's deposition testimony.

¶50          The settlement agreement was disclosed to the trial court, did not result in a "sham" trial lacking adverse parties, and did not require that PHM change its tactics or motives in defending the case, as in *Alcorn*. The court did not err in approving the settlement agreement, or in denying the motion for a new trial on that ground.

**Sufficiency of the Evidence**

¶51          PHM argues the trial court erred in denying its motion for a new trial because the verdict shocked the conscience and was not supported by evidence, and because Sandretto's counsel made improper statements during closing argument.

¶52          In ruling on a motion for a new trial, the trial judge sits as the ninth juror. *Hutcherson*, 192 Ariz. 51, ¶ 23, 961 P.2d at 453. "The basic question he or she must ask is whether the jury verdict is so 'manifestly unfair, unreasonable and outrageous as to shock the conscience.'" *Id.*, quoting *Young Candy & Tobacco Co. v. Montoya*, 91 Ariz. 363, 370, 372 P.2d 703, 707 (1962). The amount of a damages award is "'a question peculiarly within the province of the jury, and such award will not be overturned or tampered with unless the verdict was the result of passion or prejudice.'" *In re Estate of Hanscome*, 227 Ariz. 158, ¶ 12, 254 P.3d 397, 401 (App. 2011), *quoting Larriva v. Widmer*, 101 Ariz. 1, 7, 415 P.2d 424, 430 (1966). We do not reweigh the facts in considering whether there was sufficient proof to support the jury's verdict. *Hutcherson*, 192 Ariz. 51, ¶ 27, 961 P.2d at 454. "[V]erdict size alone does not signal passion or prejudice." *Id.* ¶ 36. Further, if the size of the verdict is exaggerated "in an area in which reasonable persons may differ, the trial court should not lightly conclude that it is tainted." *Estate of Hanscome*, 227 Ariz. 158, ¶ 13, 254 P.3d at 401.

¶53          PHM's argument on appeal relies in large part on its arguments that much of Sandretto's expert testimony was inadmissible, which we have addressed above. PHM admits, "The verdict may have been supported by the evidence that the trial court admitted, but the errors by the court deprived PHM of a fair opportunity to challenge the testimony."

**¶54**        We first must consider whether Sandretto proffered sufficient evidence of her past and future medical expenses.  Her past medical expenses totaled approximately $330,000.  Her economic expert, Stan Smith, determined her future medical expenses totaled almost $2 million, based on the life care plan created by Lukens.  Smith also calculated her lost earning capacity until retirement somewhere between approximately $400,000 and $740,000, depending on pay.  Loss of household services was totaled at approximately $485,000.  In total, Sandretto provided evidence of economic losses of up to $3.5 million.

**¶55**        The jury was instructed to compensate Sandretto not only for her existing and future medical bills or lost earnings, but also for damages including pain, disfigurement, anxiety, and loss of enjoyment.  Sandretto demonstrated for the jury that her knee is locked in position, requiring her to walk on her toes.  Her boyfriend testified that riding in the car causes her pain, and she cannot travel long distances.  PHM's own expert agreed Sandretto's pain was real.  Because reasonable people may differ as to how much Sandretto should be compensated for her pain, we do not find the trial court erred denying the motion for a new trial.  *See Estate of Hanscome*, 227 Ariz. 158, ¶ 13, 254 P.3d at 401.

**¶56**        PHM's assertion of improper closing arguments is waived on appeal because it failed to object at trial.  *See Copeland v. City of Yuma*, 160 Ariz. 307, 309-10, 772 P.2d 1160, 1162-63 (App. 1989).  Waiver will not apply, however, if serious misconduct actually influences the verdict.  *See Monaco v. HealthPartners of S. Ariz.*, 196 Ariz. 299, ¶ 18, 995 P.2d 735, 741 (App. 1999).  PHM contends Sandretto made two improper arguments:  (1) that Sandretto was "in jail" because "[h]er body is her prison" and that "she can hear [PHM] laughing," and (2) that the jury should award $9 million because that figure would essentially double the economic damages and past and future medical expenses.  The trial court found no misconduct in Sandretto's closing arguments, and we will not reverse that discretionary finding "'unless the record clearly establishes that the trial court was incorrect.'"  *See id.*, *quoting Grant v. Ariz. Pub. Serv. Co.*, 133 Ariz. 434, 455, 652 P.2d 507, 528 (1982); *see also Ritchie v. Krasner*, 221 Ariz. 288, ¶ 52, 211 P.3d 1272,

1287 (App. 2009) (trial court in "best position" to determine whether misconduct materially affected rights of other party).

¶57        PHM relies on the size of the verdict to support its contention, stating that "on the basis of the evidence introduced at trial . . . [the verdict] clearly demonstrate[s] that the damages were not only excessive and unsupported by the evidence, but were undoubtedly the result of passion and prejudice." Because we have reviewed the record and determined the verdict was based on substantial evidence, we cannot say that the record clearly demonstrates reversible error. *See Monaco*, 196 Ariz. 299, ¶ 18, 995 P.2d at 741.

## Disposition

¶58        For the foregoing reasons, we affirm the trial court's denial of PHM's motion for a new trial.