NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

DAVID YAMAMOTO, an individual, *Appellant*,

*v.*

KERCSMAR & FELTUS, PLLC, as Special Administrator for the Estate of
Miyuki Yamamoto, *Appellee*.

No. 1 CA-CV 14-0580
FILED 4-19-2016

Appeal from the Superior Court in Maricopa County
No.  CV2012-011079
The Honorable Dean M. Fink, Judge
The Honorable Christopher Whitten, Judge

**AFFIRMED**

COUNSEL

Dominguez Law Firm, P.C., Phoenix
By Antonio Dominguez, Lisa M. Montes
*Counsel for Cross-Defendant/Appellant*

Kercsmar & Feltus, PLLC, Scottsdale
By Todd Feltus, Molly Eskay
*Counsel for Cross-Plaintiff/Appellee*

---

**MEMORANDUM DECISION**

Judge Jon W. Thompson delivered the decision of the Court, in which Presiding Judge Randall M. Howe and Judge Lawrence F. Winthrop joined.

---

**T H O M P S O N**, Judge:

¶1        Appellant David Yamamoto (David) appeals from the trial court's final judgment in favor of his mother Miyuki Yamamoto[1] (Miyuki) in the amount of $155,690.20 from the Charles Schwab & Co. (Schwab) monies held by the clerk of the court, $7,642.50 in IOLTA trust funds from Dominguez Law Firm, P.C., $92,887.55 in attorneys' fees incurred prior to the judgment, $9,046.54 in post-judgment attorneys' fees, and costs. Finding no error, we affirm.

FACTUAL AND PROCEDURAL HISTORY

¶2        This is a contentious case involving members of the Yamamoto family and their disputes related to the care of their mother, Miyuki, and the control and ownership of certain funds. Miyuki had two children: David and Jeannie. In 2010, David attempted to have himself named as ninety-one year old Miyuki's conservator and guardian.[2] David voluntarily dismissed his petition before an answer was filed. In the same action, Miyuki subsequently filed a petition to reopen the case and a "Petition for Return of Assets, Misrepresentation to the Tribunal, Elder Abuse, A.R.S. § 46-456 Exploitation of a Vulnerable Adult, Theft" against David. She alleged David stole from her and had deposited the money into a Schwab account solely in his name. The trial court granted Miyuki's motion to reopen and found that the funds belonged to her rather than David. David appealed and the probate action resulted in a 2012 Court of Appeals memorandum decision holding the probate court did not have jurisdiction to reopen the case and, therefore, to grant Miyuki's motion, as the case had already been dismissed. *See In re Guardianship of Yamamoto*, 1 CA-CV 11-0132, Slip op. (Ariz. App. May 8, 2012).

---

[1] Miyuki died in November 2014, and her estate was substituted in however for ease of reference we refer to both as "Miyuki."

[2] PB2010-000297

¶3          Briefly, this case began with Schwab's interpleader over ownership of the Schwab funds of $155,690.20. The money at issue originated with the 2006 sale of six acres on Camelback Road which resulted in net proceeds of $818,955.61. Of that $818,955.61, David claimed half was his because Miyuki had gifted it to him just before the Camelback sale.[3]  According to David, Miyuki used $377,663.52 of her funds to purchase the Rovey home and deposited the balance of $31,814.29 along with his $409,477.80 in the "first" Wells Fargo joint account under both their names. Between 2006 and 2010, in a series of transactions, the ever-diminishing money was moved between accounts and/or institutions at least three times. In the final two transactions, from the "second" Wells Fargo account to the "third" Wells Fargo account, then to Schwab, David's name appears as the sole owner on the accounts. David asserts that he was merely moving his half of the Camelback property proceeds.

¶4          Miyuki cross-claimed against David for declaratory judgment over the funds in the Schwab account, a Wells Fargo account, and money transferred into attorney Antonio Dominguez's trust account. Miyuki alleged that David had been stealing her life savings while failing to care for her health and well-being. David answered Miyuki's cross claim and sought his own declaratory judgment over the disputed funds. Miyuki filed a motion for release of confidential Adult Protective Services (APS) records from 2008-2013 regarding the situation between her and David. The first report to APS came from the bank who had concerns over the handling of Miyuki's money. Over David's objection, the trial court granted her motion and the 17 pages of APS documents and a transcript of David's APS interview were filed under seal and were available to the trial court in the record.

¶5          David moved for summary judgment on the declaratory judgment. Miyuki sought leave to amend her complaint to add a claim for Exploitation of a Vulnerable Adult in violation of Arizona Revised Statutes

---

[3] The conveyance and reconveyance of the Camelback property occurred multiple times between 2003 and 2006. David testified he didn't know why the transfers were being made other than for tax purposes and pursuant to advice from Roger Brown. The factual details of those transfer not being significant to this decision, given the finding by the trial court that David was her de facto conservator at the time of the Camelback sale, we need not detail them here.

(A.R.S.) § 46-456 (2009) [4], the Adult Protective Services Act, which the trial court granted. Miyuki next moved for summary judgment regarding the Schwab funds and the trust account funds on the basis of judicial estoppel and judicial admission, citing David's 2010 pleading in the probate case which attributed all of the $335,000 in the "second" Wells Fargo account to Miyuki as one of her assets. He disputed both the facts and law as laid out by Miyuki. David moved for summary judgment as to his mother's claim for Exploitation of a Vulnerable Adult. He also filed a motion to strike some of Miyuki's factual assertions made in support of her motion for summary judgment.

**¶6** Litigation on all of the motions continued. With trial approaching, the parties filed a Joint Pretrial Statement. On October 18, 2013, the trial court ruled on the motion to strike, granting it in part. The trial court denied Miyuki's motion for summary judgment on the basis that the procedural postures of the parties in the probate action, which was dismissed before being litigated, could not support either a claim of judicial estoppel or of judicial admission. In the same ruling, the trial court denied David's motion for summary judgment on statute of limitations grounds for the vulnerable adult statute. The trial court found that Miyuki's good faith filing in August 2010, seeking return of her assets, was "plainly timely" and found her new claim was saved by the savings statute, A.R.S. § 12-504 (2003). The trial court denied David's motion for reconsideration. The parties filed an amended pretrial statement.

**¶7** The trial on these matters was held over two days. Roger Brown and David testified on David's behalf. Mr. Brown was for many years both David and Miyuki's financial advisor and accountant. Jeannie's husband, Cameron Losey, and Mr. Waller, the President of Miyuki's church, also testified. The court read APS investigator Mr. Dettelback's deposition. Numerous exhibits were admitted, including bank statements and pictures reflecting the state of the Rovey home.

**¶8** The trial court ruled on January 27, 2014, in favor of Miyuki. Miyuki was found to be a vulnerable adult since, at least, 2005. Trial court found David was acting as her de facto conservator since, at least, 2005,

---

[4] The 2009 version of A.R.S. § 46-456, which uses the phrase "solely for the benefit of the vulnerable adult, " is applicable here. That statute has an effective date of January 1, 2009. David attempted to have himself named guardian in 2009 and Miyuki's APSA theft claim was first asserted in 2010. David continued to move and use Miyuki's ever-diminishing assets from 2009 through late 2010. David signed a tax return in 2010.

until Miyuki was removed from his care in 2009 by his sister Jeannie. The trial court found that David, for example, had signed a tax return for Miyuki as late as 2010 without legal authority to do so. Neither David nor his accountant-witness were found to be credible. The trial court found no credible evidence that Miyuki gifted David with an interest in the Camelback property. All of the funds from the Camelback sale were determined to be Miyuki's and, therefore, the funds held by Schwab and Dominguez were Miyuki's. David was found to have violated A.R.S. § 46-456 for exploitation of a vulnerable adult while in a position of trust. Jeannie, David's sister, was named conservator. The court found that Miyuki did not meet her burden of proof under A.R.S. § 46-456(C) of damages beyond the Schwab account and trust account. Miyuki was awarded over $92,000 in attorneys' fees.

¶9        A final judgment was entered and David appealed. David moved for new trial, which the trial court denied. The trial court awarded Miyuki an additional $9,046.54 in attorneys' fees for having to respond to David's unsuccessful motion for new trial. David moved for reconsideration from the fees order, which was denied. David again appealed.[5] Miyuki passed away in November 2014.

## ISSUES

¶10       David raises these issues on appeal:

1. Whether the trial court erred in finding that Miyuki's APSA claims were within the statute of limitations, finding that the savings statute applied, and finding the claims related back to her probate claim;

2. Whether the trial court erred in finding in favor of Miyuki on the facts, and

3. Whether the trial court erred in granting pre-judgment and post-judgment attorneys' fees.

---

[5] Two final judgments pursuant to Arizona Rules of Civil Procedure, Rule 54(b) were entered, and two timely notices of appeal were entered. We treat these as constituting one case.

DISCUSSION

## A. The Timeliness of Miyuki's APSA Claim

¶11        In 1988, the Arizona legislature determined that elder abuse in Arizona was a serious issue justifying legislative intervention and they enacted the Adult Protective Services Act (APSA), which criminalized abuse of an incapacitated or vulnerable adult, designating elder abuse a class 5 felony, and created a statutory civil cause of action. *Denton v. Superior Court*, 190 Ariz. 152, 156, 945 P.2d 1283, 1287 (1997) ("The legislature's intent and the policy behind the elder abuse statute are clear. Arizona has a substantial population of elderly people, and the legislature was concerned about elder abuse."); A.R.S. § 46-456. It is a civil claim under that statute which is before us.

¶12        We defer to the trial court's factual findings unless clearly erroneous. *See Ahwatukee Custom Estates Mgmt. Ass'n v. Turner*, 196 Ariz. 631, 634, ¶ 5, 2 P.3d 1276, 1279 (App. 2000). A factual finding is clearly erroneous only where no substantial evidence supports it. *See Visco v. Universal Refuse Removal Co.*, 11 Ariz. App. 73, 75, 462 P.2d 90, 92 (1969). We review the interpretation and application of statutes de novo. *Schwarz v. City of Glendale*, 190 Ariz. 508, 510, 950 P.2d 167, 169 (App. 1997) (citation omitted).

¶13        On appeal, David argues that Miyuki's 2012 APSA claim was time-barred under A.R.S. § 46-456(F), because it came more than two years after her actual discovery of her cause of action. He argues that his mother knew as early as November 2009 that he was removing funds from her accounts, and as of January 2010 that he had removed all of the funds from her accounts.[6]

¶14        In response, Miyuki asserts three arguments. First, she argues, that her August 20, 2010, filing in the probate court sought the same relief against David as in her latter cross-claim and that the pleading came well before the late 2011 deadline asserted by David. That petition was entitled "Petition for Return of Assets, Misrepresentation to the Tribunal, Elder Abuse, A.R.S. § 46-456 Exploitation of a Vulnerable Adult, Theft." Second, she argues, that she then timely filed her cross-claim in this action

---

[6] To this end, he also argues that some of the alleged exploitation of Miyuki as a vulnerable adult occurred in 2005 and should be time-barred as either Miyuki or Jeannie could have filed a timely APSA claim against him then, but they failed to do so. We need not address this issue.

by filing it less than the six months from the June 13, 2012, Court of Appeals mandate on the probate court action as provided for in A.R.S. § 12-504(B). Third, she argues that her amendment to her cross-claim, to add the specific claim of a violation of APSA, was done with permission of the trial court and related back to the original probate claim. The trial court found her filing "plainly timely" and we agree.

¶15            In general, a cause of action accrues and the statute of limitations begins to run when one party is able to sue another. *Sato v. Van Denburgh*, 123 Ariz. 225, 227, 599 P.2d 181, 183 (1979); *Norton v. Steinfeld*, 36 Ariz. 536, 544, 288 P. 5 (1930). Accrual is based on the plaintiff's knowledge of the facts underlying the cause of action. *Doe v. Roe*, 191 Ariz. 313, 322, ¶ 29, 955 P.2d 951, 960 (1998). Rule 15(c), Arizona Rules of Civil Procedure, provides that:

> Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading.

¶16            The trial court found that Miyuki's APSA claim was asserted in her 2010 probate filing. It found that her 2012 cross-complaint was filed within the six month deadline of the 2012 Court of Appeals mandate. The court held the amendment by Miyuki to add a claim under the APSA to her cross-complaint related back under Rule 15(c) as being part of the same conduct, transaction and/or occurrence of David's misappropriation of Miyuki's money.

¶17            David argues that the trial court erred in applying the savings statute to Miyuki's APSA[7] claim. A.R.S. § 12-504(A).[8] Specifically, he argues

---

[7] We note, as did Miyuki, that David's claims regarding the statute of limitations appear to apply only to the APSA claim, not to the declaratory action.

[8] Section 12-504(A), "Saving of action timely commenced," provides in pertinent part:

> If an action timely commenced is terminated by abatement, voluntary dismissal by order of the court or dismissal for lack of prosecution, the court in its discretion may provide a period for commencement of a new action for the same cause,

that the former probate action was a "nullity" insufficient to count as a timely first filing by Miyuki. *See Yamamoto*, 1 CA-CV 11-0132, Slip op. at 1, ¶ 7. This argument comes from the use of the word "nullity" in the former Court of Appeals determination. This court said "the [probate] court did not have jurisdiction to decide any motions after the case was dismissed and those actions are a nullity." *Id.* We, like the trial court, are not persuaded that such language rendered Miyuki's motion non-existent for statute of limitations purposes. David reads that decision too broadly.

**¶18**        This court will reverse a trial court's order denying relief under A.R.S. § 12-504(A) only for an abuse of discretion. *Jepson v. New*, 164 Ariz. 265, 274, 792 P.2d 728, 737 (1990). The trial court has discretion to grant up to six months leeway under the savings statute. *Copeland v. Ariz. Vet. Mem'l Coliseum & Exposition Ctr.*, 176 Ariz. 86, 91, 859 P.2d 196, 201 (1993). The court before ruling should ascertain whether the plaintiff acted reasonably and in good faith, whether the case was prosecuted diligently, whether a procedural defect exists to prevent the filing of a second action, and whether either party will be substantially prejudiced. *See id.; citing Gorman v. City of Phoenix*, 152 Ariz. 179, 183, 731 P.2d 74, 78 (1987). This is not a matter of a plaintiff asserting a claim under the savings statute after he failed to act diligently and vigorously in making the second claim. *See Copeland*, 176 Ariz. at 92, 859 P.2d at 201; *Schwartz v. Ariz. Primary Care Physicians*, 192 Ariz. 290, 296, ¶ 20, 964 P.2d 491, 497 (App. 1998). Rather, we agree with the trial court that Miyuki acted diligently and in good faith and was under the impression, as was the probate court, that the proceeding in probate court was an appropriate avenue for recourse.

**¶19**        We agree with the trial court's determination that the August 20, 2010 claim asserted a timely claim under APSA, that Miyuki filed her cross-complaint against David in this action within the six month deadline of the Court of Appeals mandate, and that the addition of the APSA claim related back to the original claim. The trial court is affirmed.

### B. The Sufficiency of the Evidence Against David

**¶20**        The court held that David violated A.R.S. § 46-456 "because he was a person in a position of trust and confidence to his mother, a

---

although the time otherwise limited for commencement has expired. Such period shall not exceed six months from the date of termination.

vulnerable adult, and he failed to use the vulnerable adult's assets solely for her benefit. Indeed, he used his mother's assets for his benefit." The trial court found Miyuki was a vulnerable adult as far back to, at least, 2005, that David was her de facto conservator, that she had no donative intent regarding the Camelback property, that the transfer, if any, occurred while David was acting as the de facto conservator, and that all the proceeds in the "first" Wells Fargo account belonged to Miyuki. The Schwab funds and the trust account funds were determined to be Miyuki's property. In reaching its ruling, the trial court found both David and Roger Brown lacked credibility. David asserts that there was no factual basis to support the trial court's award against him. To this end, he states that no witness provided evidence that he exploited Miyuki as defined by the statute. We disagree.

¶21        Section 46–456, "Duty to a vulnerable adult; financial exploitation; civil penalties" provides in relevant part: [9]

> A. A person who is in a position of trust and confidence to a vulnerable adult shall use the vulnerable adult's assets solely for the benefit of the vulnerable adult and not for the benefit of the person who is in the position of trust and confidence to the vulnerable adult or the person's relatives unless either of the following applies:

---

[9] Section 46–451(A)(2009), provides the following definitions under the APSA:

> 2. "De facto conservator" means any person who takes possession of the estate of an incapacitated or vulnerable adult, without right or lawful authority. A de facto conservator is subject to all of the responsibilities that attach to a legally appointed conservator or trustee.
> …
> 4. "Exploitation" means the illegal or improper use of an incapacitated or vulnerable adult or his resources for another's profit or advantage.
> …
> 9. "Vulnerable adult" means an individual who is eighteen years of age or older and who is unable to protect himself from abuse, neglect or exploitation by others because of a physical or mental impairment.

> 1. The superior court gives prior approval of the transaction.
> 2. The transaction is specifically authorized in a valid durable power of attorney that is executed by the vulnerable adult as the principal or in a valid trust instrument that is executed by the vulnerable adult as a settlor.

¶22    On appeal from a declaratory judgment, we view the evidence in the light most favorable to sustaining the judgment. *See Associated Aviation Underwriters v. Wood*, 209 Ariz. 137, 143, ¶ 5, 98 P.3d 572, 578 (App. 2004). Conflicts of the evidence are within the sole province of the trier of facts for determination. The trial court sitting without a jury is judge of the credibility of witnesses, the weight of evidence, and also the reasonable inference to be drawn from the evidence. *Sandretto v. Payson Healthcare Mmgt, Inc.*, 234 Ariz. 351, 359, ¶ 24, 322 P.3d 168, 176 (2014).

### 1. Miyuki Was a Vulnerable Adult

¶23    David was Miyuki's son and had been living with her nearly continuously since some time in the 1980's. He stated she had been unable to drive since "the early '90's." He was her primary caretaker, handling both daily care for her and her financial matters. He stated that she had trouble understanding "complex" financial matters. For example, in the context of discussing a car repair, he told the investigator "[I] explained it to mom, you know, who may not understand all of the aspects … Now, today if you ask her about it, I don't know, probably wouldn't remember, I guess.…I don't think she wants to be too concerned with those matters."

¶24    In his 2010 verified petition for guardianship/ conservatorship David asserted Miyuki was incapacitated with mental disability due to age which "caused her to lack sufficient understanding or capacity to make or communicate responsible decisions concerning her person." He admitted that she had been in essentially the same state since approximately 2005.

¶25    There was testimony that when Miyuki was taken in by Jeannie and her husband in December 2009, she weighed 62 pounds. Miyuki had untreated vision and dental problems which David knew about. David admitted that the new home Miyuki had purchased for over $377,000 in 2006 was "uninhabitable" three years later. He admitted that in 2008 five dumpsters of his trash was removed from the Rovey yard. Exhibits 81 and 82, pictures of the state of the Rovey house from 2008 and 2009, accurately showed the state of the house. One picture shows a dead rat in the bathroom. This is evidence upon which a reasonable trier of fact

could determine Miyuki was a vulnerable adult who was unable to protect herself from abuse, neglect, or exploitation.

### 2. David Was the De Facto Conservator

**¶26** In 2009, David admitted to the APS investigator that he knew he'd been acting as the de facto conservator "all this time." He arranged for the bills to be paid and met nearly weekly with bank personnel over the finances. He admitted signing at least two years tax returns without Miyuki's authority, including in 2010 when she no longer lived with him. He admitted that Miyuki had never met with Roger Brown, their mutual accountant, without David himself being present since 2000 or alone with bank personnel from approximately 2006 through 2009.

### 3. Miyuki Was Being Exploited for David's Benefit

**¶27** David admitted that he rarely worked and made little financial contribution. He admitted that there was a $25,000 installment loan and a $95,000 home equity line of credit on the Rovey house, under both their names, although Miyuki had sole title. He admitted that he transferred Miyuki's December 3, 2009, social security check into the bank account under his name. In December 2009, during his interview with APS, David was confronted with a copy of a draft trust that had recently been prepared disinheriting Jeannie and leaving everything to David. That result was in conflict with what Miyuki told the investigator she wanted to happen. David admitted that his mother had not yet met with the lawyer drafting the trust without him.

**¶28** Further, David did not make the claim that he owned half of the money in the accounts as his half share of the Camelback sale price until recently. In his verified 2009 petition for guardianship/conservatorship, David stated that Miyuki's assets included $335,000 in the "second" Wells Fargo account from the sale of the Camelback property. Evidence in the record shows that in David's 2009 interview with APS, the following exchange occurred:

> Dettelback: One of your contentions is that this money [originally $335,000], even though it's got your name on the account, that this money is actually your mother's money.
>
> David: It's Mom's money, right.

David admitted that the $335,000 in the "second" Wells Fargo account was depleted by him by approximately $155,000 in under five years, without an

explanation as to where the money was spent. He stated they were "frugal" with money. He admitted that he transferred the remainder of the money in the "second" Wells Fargo account, in both their names, to an account solely in his name after Miyuki moved in with Jeannie. David admits that under his theory of the case, Miyuki would have had no assets left after her purchase the Rovey house and the $42,000 annuity purchased at the bank's suggestion, while he would have a remainder of $409,477.80. All of the above is evidence upon which a reasonable trier of fact could determine Miyuki was being exploited by David for his own benefit. For the above stated reasons, we affirm the trial court.

**The Attorneys' Fees Awarded Against David Below**

**¶29** David challenges the trial court's award, under A.R.S. § 46-456(B) (2013), of $92,887.55 for attorneys' fees incurred prior to the judgment and of $9,046.54 in post-judgment attorneys' fees. That statute provides:

> A person who violates subsection A of this section . . . *shall* be subject to actual damages and reasonable costs and attorney fees in a civil action brought by or on behalf of a vulnerable adult and the court may award additional damages in an amount up to two times the amount of the actual damages. [Emphasis added.]

A.R.S. § 46-456(B).

**¶30** We review the award of attorneys' fees for an abuse of discretion. *Geller v. Lesk*, 230 Ariz. 624, 627, ¶ 8, 285 P.3d 972, 975 (App. 2012), as amended (Sept. 26, 2012). The basis for David's objection to the pre-judgment fees centers on the fact that the trial court erred in its decision that his mother was vulnerable and that he exploited her. Having affirmed the trial court on those issues, we find A.R.S. § 46-456(B) applies and the trial court was required to assess pre-judgment fees against David. We, therefore, affirm as to the pre-judgment fees. [10]

---

[10] We find Miyuki's claim for attorneys' fees was sufficiently timely and specific to suit Rule 54(g). *See Pendergast v. City of Tempe*, 143 Ariz. 14, 22-23, 691 P.2d 34, 42-43 (App. 1984) (finding fee award based on A.R.S. § 12-341.01, where it was first requested after the grant of summary judgment, was sufficiently timely and that opposing party had sufficient notice that fees were being sought).

**¶31** David objects to the post-judgment fees, asserting: (1) that the statute provides only for pre-judgment fees, and (2) that the trial court lost jurisdiction over the matter after it issued its May 13, 2014, final judgment. We are not persuaded by David's arguments. We find the plain meaning of the statute's fee language includes both pre- and post-judgment attorneys' fees under A.R.S. § 46-456(B). *Janson v. Christensen*, 167 Ariz. 470, 471, 808 P.2d 1222, 1223 (1991). We note that below this litigious action continued in full fashion after the judgment, including David's motion for new trial and his motion for reconsideration. We have decided for judicial economy to treat David's challenges in this court as one appeal. The fee award is the subject matter of the second judgment and the consequent notice of appeal. The fees in the second judgment were a consequence of David's filings, having rejected them, the judge properly awarded fees to Miyuki**.**

### Attorneys' Fees on Appeal

**¶32** On appeal, both parties seek attorneys' fees and costs. Miyuki seeks fees pursuant to A.R.S. §§ 12-341.01 (2003), 46-456(B). As the prevailing party on appeal, Miyuki is entitled to attorneys' fees in an amount to be determined, and costs pursuant to ARCAP 21.

### CONCLUSION

**¶33** For the above stated reasons, the trial court is affirmed.



Ruth A. Willingham · Clerk of the Court
FILED : ama